Donald SOUTHWORTH, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2012–SC–000179–MR.

Supreme Court of Kentucky.

March 20, 2014.

As Modified March 21, 2014.

As Modified on Denial of Rehearing
June 19, 2014.

Shannon Renee Dupree, Jason Apollo Hart, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Jack Conway, Attorney General, James Daryl, Havey Assistant Attorney General, Office of the Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court By Justice
NOBLE

Donald Southworth was convicted of murdering his wife, Umi Southworth, and was sentenced to life in prison. He raises numerous issues on appeal, including that he was entitled to a directed verdict and that the trial court admitted evidence of other acts in violation of KRE 404(b). While Southworth was not entitled to a directed verdict of acquittal, and therefore may be retried, the admission of the other-acts evidence was in error and prejudiced Southworth. For that reason, his conviction is reversed.

## I. Background

Donald Southworth[1] married Umi Southworth in the mid–1990s. She had been working at a bank in Indonesia when they met. They settled in Lexington, Kentucky, where Southworth was an overnight UPS driver. They had a daughter, Almira, in 1997. Umi worked at the cor-

---

1. We will refer to the Appellant as "South- worth." His wife is referred to as "Umi."

porate headquarters of the restaurant chain Fazoli's.

Almira began playing guitar and singing when she was six. Apparently, she was quite talented and had a promising future as a musician. In fact, she frequently performed at restaurants and churches in Lexington, and had begun to travel to perform. Her parents had been contacted by promoters and producers, who worked with the family on Almira's career.

By 2010, however, Southworth and Umi's marriage was moving toward an end. They were getting a divorce, and Umi was planning to move to Nashville with her daughter to help with her fledgling music career. Almira had signed a contract with Buck Williams, a music agent and manager in Nashville. June 9, 2010 was to be Umi's last day at work before the move.

But Umi never showed up to work that day and could not be found. Some of her co-workers went to her apartment complex to look for her. They found some of Umi's belongings scattered outside the apartment building: a pair of her shoes, with one under her car and one by the garbage cans, and her keys in the yard. Southworth had been contacted by his daughter, and he returned home from an overnight shift at UPS sometime in the morning. Over the course of the morning, Southworth spoke with some of Umi's co-workers, telling at least one that his wife might be with her boyfriend. Apparently, the co-workers were concerned about Southworth, as one testified that she had asked him where Umi was and stated to him "I know you know where she is."

At 11:47 a.m., Southworth called 911 to report his wife missing, though he stated that she often disappeared and went to visit friends. During the call, he mentioned the pending divorce, laughing at it, and stating that it was just on paper and that they were not actually breaking up. He also stated that Umi's co-workers had gotten him "jumpy." He declined to have an officer dispatched and said he would go to the police station to file a report.

The co-workers continued to look for Umi. They encountered a police officer, Susan Brown, in the neighborhood and reported the disappearance to her. The officer went to the apartment complex around noon, just as Southworth and Almira were starting to drive away. The officer asked Southworth some questions. He said he was going to file a report at the station; that Umi had been up late texting a boyfriend, a musician whose name he did not recall; that Umi frequently walked around the neighborhood while texting or talking on the phone to the boyfriend; and that he and Umi were not actually breaking up when she moved to Nashville but that he wanted a divorce on paper so he could date other women. Officer Brown offered to take a report and asked Southworth for the name and phone number of the boyfriend. Southworth reiterated that he was on his way to the police station to report the disappearance.

At 12:49 p.m., Southworth called John DeGrazio, a contemporary-Christian musician and producer in New Jersey, with whom Umi had been corresponding by email, text, and telephone since 2009, and whom the family had met in person at least once. DeGrazio was helping with Almira's music career. He was the person Southworth referenced when he mentioned Umi's boyfriend, despite claiming at times that he did not know the identity of the alleged boyfriend. DeGrazio missed Southworth's call.

Southworth did not arrive at the police station until 2:45 p.m., where he met with Sergeant Chris Woodyard an hour later. After noting Umi's disappearance, he told

Woodyard that she had a boyfriend, whom he had tried to call that morning. When Woodyard asked for the boyfriend's name and number, Southworth claimed that he could not recall it, and that the information was on his mobile phone, which was in the family's other car. Southworth said that his wife's shoes and keys had been found in the yard. Woodyard did not take a missing-persons report at that time, stating they were not filed until the person had been missing for 24 hours. Woodyard offered to send an officer to investigate, but Southworth declined, saying he had to go to Cincinnati but that he would call if circumstances changed. Shortly after leaving, Southworth called to clarify whether the report would be filed after 24 or 48 hours.

Around 4:30 p.m., Southworth called one of Umi's co-workers to see if they had heard anything and to explain that a missing-persons report could not yet be filed. The co-workers continued to search for Umi. Around 5:30 p.m., they checked her office voicemail and heard a message containing what sounded like a scuffle and a reference to a killing. Though this message later turned out to be innocuous—it was recorded during an inadvertent dial when Almira had been playing video games—police opened an investigation upon hearing it. Lieutenant Mark Brand was dispatched to the Fazoli's headquarters to listen to the message. Several other officers were dispatched to the Southworth residence.

After listening to the voicemail, Lieutenant Brand called Southworth, who was returning to Lexington with Almira and his youngest daughter (from another relationship, described below). This conversation was recorded. Southworth stated that his wife had been up late text messaging and had told him she intended to get up at 4:00 a.m. He was surprised that the police had opened an investigation but agreed to meet Lieutenant Brand at the Fazoli's headquarters. Instead of meeting Brand, however, Southworth went home.

Other officers were already at the apartment. They were concerned by the voicemail and performed a protective sweep of the residence. They did not find anyone or any signs of an altercation, blood, or that a crime scene had been cleaned up. They searched around the property and found nothing.

Southworth arrived at the apartment around 7:00 p.m. He spoke with Officer Todd Phillips, who secretly recorded parts of the conversation. Southworth mentioned DeGrazio by name at that point, saying that Umi loved him. He again said that Umi walked around the neighborhood when she talked with DeGrazio. This time, however, he claimed he was way past being jealous and had told Umi that DeGrazio was "family." He also insisted that he and Umi were still in love. At some point, he also denied having a reason to kill Umi, which the Commonwealth describes as having been gratuitous at the time, and he later denied having killed her.

A pair of officers continued to search the grounds of the apartment complex. Near the tree-line behind the complex, they found a "hobo camp," which consisted of a piece of plywood that had been set up as a shelter over a twin-sized box spring (also referred to as a mattress in some of the filings) and a rug.

The officers lifted the mattress and found Umi. She was lying face down, was naked, and had a belt wrapped loosely around her neck. Her skin was an unnatural color and sunken in, and she had a wound to the back of her head, which was matted with blood and brain tissue and had flies on it. The officers believed she was dead and began processing the scene for evidence.

Police strategically chose not to tell Southworth what they had found. They instead asked for a picture of Umi and asked Southworth to go to the police station. Before leaving for the station, Southworth told one of the officers, "So you have not found her yet. That's good—I meant not good, you've not found her yet. But that means she's still okay." At headquarters, he said, "I never killed my wife, officer. She should have stayed inside. This is going to mess everything up."

Police continued processing the scene where Umi had been found. They retrieved a broken tree limb with blood on one end, and collected a swatch of apparently bloody fabric from the box spring. They also found Umi's nightdress and sweater nearby. Various other items, such as a bag of clothing, shopping bags, a garbage bag, and a stolen wallet, were found in the area. The clothing was not Southworth's size, though the belt found around Umi's neck was. (Almira later testified that the belt was similar to ones from the apartment but she could not say for sure it was from her home.) The box spring, except for a fabric swatch, was not collected, nor was the plywood.

Soon after Southworth left to go to the station, the coroner arrived at the residence. He found that Umi was still alive. She was transported to the University of Kentucky Medical Center. Doctors found that Umi had significant head trauma, with two skull fractures and brain matter leaking out, and blunt force trauma to her chest. Maggots were present in the head wound. Umi was clinically brain dead with no chance for recovery.

Meanwhile, Southworth was still being questioned by police. He told them of the alleged affair between Umi and DeGrazio, in which Umi would see DeGrazio when he was in town (even though DeGrazio never visited Kentucky). He also claimed De-Grazio had a home in Nashville, which was not true. During this interview, Southworth again claimed that the divorce was only to be on paper. He also claimed he had bluffed Umi by telling her that he could listen to her cell phone calls on a scanner, which is why she walked on the street while using the phone. (Neighbors interviewed by police had never seen Umi walking around the neighborhood talking on the phone.) Southworth also told officers that Umi had text messaged DeGrazio late that night and had intended to get up at 4 a.m. He claimed he was woken at 3:18 a.m. by a call from work.

That call had gone unanswered. (In fact, the dispatcher who made the call later testified that he had received a busy signal.) Southworth had been scheduled to work at 3:15 a.m., and another worker had been scheduled in his place when he failed to show up for his shift or answer the phone. At 3:30 a.m., Southworth had called the dispatcher at work, who had told him that his shift had been re-assigned. Despite having no-show days available, meaning he could skip the shift without penalty, Southworth had begged to come into work. The dispatcher had then rearranged the schedule so that Southworth could still work that night, and Southworth had clocked in at 3:35 a.m. (Later testimony established that Southworth had been late to work only one other time in the preceding seven years.)

When Southworth was being questioned by police, he emphasized this work alibi. When officers eventually revealed to Southworth that Umi had been located and was at the UK hospital, he told them, "I didn't hurt her. Can I see her, please?" The officers asked Southworth who had a motive to hurt Umi, and he brought up two male tenants in the apartment complex. He quickly discounted these men, saying

that one was at work and that one was gay.

When questioned about arriving back home that morning, he said he had been with his daughter the whole time since then, which she later confirmed. He claimed that he had walked through the back yard and saw what looked like a camp back in the trees. He said nothing about going into the camp. A detective then told Southworth that they would be able to retrieve touch DNA from the scene to identify her assailant, and Southworth admitted to having walked through the area where Umi was found. (Almira, however, in her taped statement, said that Southworth did not go into the woods at that time.) Southworth also admitted to having lifted the rug that was on the box spring, and said he may have touched or sat on the box spring. He also said he picked up the bag of clothing and shook it. After the interview, officers asked if Southworth wanted a ride to the hospital, but he asked instead to be taken to a hotel.

The investigation continued. In the Southworth apartment, police found that the washing machine had been set on hot and contained a pair of women's underwear, a pair of size–10.5 black leather shoes, a pair of UPS pants, a UPS hat, and other clothes. Investigators swabbed the inside of the washing machine but found no blood present. Investigators also saw no stains on the clothing and did not collect those items as evidence or test them for blood. A copy of a divorce petition was found in a trash can. Police also searched the Southworths' cars but found no evidence of blood or cleaning.

Forensic examination of Umi's injuries revealed that the crown of her skull had been caved in. This wound was consistent with being struck by a hammer-like object (though no such object was found by police), and the blow would have rendered her unconscious and may have been fatal. Several tears of the skin on the crown of the skull and near the left ear showed several blows from a club-like object. Bone fragments protruded through these tears. Umi's face was scraped and bruised, and her nose was broken. The conclusion was that Umi died of multiple blunt-force trauma that caused massive bleeding and swelling of the brain.

The belt had left no marks on Umi's neck. While there was no evidence of injury to Umi's genitals, a vaginal swab revealed semen. No silicone or starches indicative of a condom were found. DNA tests of the semen revealed it was not Southworth's (or John DeGrazio's), and it was not matched to anyone else.

A forensic entomologist analyzed the maggots from Umi's head. He testified that they were indicative of a mortal wound. The entomologist found, based on the maggots' larval stage, that flies would have settled on Umi just after sunrise (around 6:15 a.m.). Based on this, he believed the injuries had occurred three to several hours before, though it was possible that the injuries had occurred as late as 4:00 a.m. and far less likely that they occurred at 5:00 a.m. (Southworth eventually postulated to police that Umi had been assaulted when she awoke at 4:00 a.m. and had gone outside to talk on her phone.)

DNA tests of samples from the bloody swatch from the box spring and the tree limb showed that they belonged to Umi. Her blood was also found on the rug at the scene, and a single drop of blood was found on one of the shoes that had been recovered from the yard.

The only other DNA found at the scene was from a single drop of blood on Umi's nightdress. That DNA was found to be Southworth's, though how long the blood

had been on the nightdress could not be determined.

A dog search the next day turned up Umi's purse beside a garbage bag behind the apartment complex. Umi's cell phone (turned off) and credit cards were in the purse, but no cash was found. The garbage bag was the same type as that found at the scene and that the Southworths kept in their kitchen. The garbage bag found with the purse contained a washcloth, a roll of paper towels, and a disposable Carthage brand cup. The paper towels were identical to the ones found in the Southworth home and had markings suggesting they could have come from the same lot. The cup also was identical to some found in the Southworth home. Tests of the washcloth and paper towels showed no chloroform or other substances.

A search of a computer in the Southworths' home turned up a copy of the divorce petition, which had been created and printed on May 28, 2010. Cell phone records showed that Umi's last incoming call had been from Southworth, at 7:08 p.m. on June 8, 2010. Umi had sent a text to John Degrazio at 11:25 p.m., and the two exchanged several messages over the next couple of hours. The last outgoing activity on her phone was a text to DeGrazio; it had been sent at 1:42 a.m. on June 9, 2010. Her phone showed several unread texts starting around 7:00 a.m., including several from her husband.

Police did not hear from Southworth again until June 17, 2010, when he called to ask how to get his car and phone back. This conversation was recorded by the detective taking the call. Southworth added to the story he had previously told about looking in the area where Umi's body was found, stating that the box spring had been flat on the ground and that he had actually lifted it up and had seen vines underneath. (There had, in fact, been vines under the box spring, but when the body was found by police, the box spring was raised up and the body could be seen underneath.) He also stated that he had found the rug in the back yard two months before and had thrown it in the trash. There were, however, no visible mildew stains or other signs it had been left outdoors.

Southworth was indicted and tried for Umi's murder. At trial, testimony and proof as to the facts described above was introduced at trial.

Additionally, multiple witnesses testified about the Southworths' relationship. They almost universally described Southworth as controlling, especially with respect to Almira's music career. For example, Southworth would shout directions at Almira as she performed, would not let her wear her glasses while performing, and had told a concert promoter that even though people believed Almira was the act, he had created it and it all came from him.

Similarly, witnesses testified that Southworth was controlling and inconsiderate toward Umi and that Umi was withdrawn or passive when in Southworth's presence. For example, one witness testified that during a business meeting, Southworth had declined a chair at the table for Umi, stating that she could instead sit in the back. The same witness testified that in another meeting, he said that Umi could help clean up afterward, despite being on crutches. Other witnesses testified that while Umi was talkative when Southworth was not around, she was silent when he would show up.

One witness testified that in April 2010, Southworth said that he and Umi were splitting up because she was cheating on him. This was said in front of Almira. In the same conversation, Southworth referred to Umi as a whore, and claimed to

have telephone records showing the affair and to have hired a private investigator.

Witnesses also testified that Umi had opened a bank account in her own name, had her paychecks deposited in the account, and had the statements sent to her office, presumably to hide them from her husband. They also testified that she had opened a new cellular phone account with a provider different from the one for the family account she shared with Southworth. She listed a co-worker as her secondary contact on this account. The records for this account were also hidden at Umi's office. A co-worker testified that Umi had given her a key to a safe deposit box and asked her to keep it secret.

One of Umi's friends, WiWi Harrison, testified that in May 2010 she had given Umi the name of a lawyer, presumably for the divorce. She testified that at that time Umi told her she had documents she intended to hide at work. Another witness, Patti Williams, testified that Umi kept divorce papers hidden and that she had intended to give them to Southworth when she left Lexington.

The Commonwealth also introduced testimony of one of the Southworths' neighbors who lived in the apartment across the hall. This woman testified that around midnight of June 9, 2010, she had been carrying laundry to the basement laundry room. She saw that the back door of the apartment complex was open and unlocked, which was against the apartment complex's policy. As she went back and forth doing laundry, she found the back door open two-more times. She did not see any water tracked in, though it was a very stormy night. At one point, she saw that the Southworths' door was slightly open and that Donald Southworth was hunched over the floor. She also testified that the Southworths' washing machine, which was in the basement also, was running the entire time (about an hour and a half) she did laundry that night. The woman's fiance found the back entrance unlocked again around 6:00 a.m.

Another resident of the apartment complex testified that around 3:00 a.m. she was woken by a "sharp sound." She described it as similar to "a glass breaking." She could not identify where the sound came from. On cross-examination, she admitted that it could have been thunder from storms that night.

The Commonwealth also introduced testimony of an unusual relationship between Southworth and another woman, Hesti Johnson, who moved from Indonesia to the United States, and began babysitting Almira and cooking and cleaning for the family. Johnson testified that she lived in the Southworth home from 1998 to 2005 and had a sexual relationship with Southworth. She also testified that on a trip back to Indonesia with the family, she and Southworth had a religious marriage ceremony, and that she later became pregnant by Southworth.

She also testified that in 2005, Southworth had come to her and asked her to masturbate. He then retrieved a used condom from the freezer or refrigerator and placed it inside her. She testified that he told her it was okay and that the condom had been retrieved from the garbage of a friend named Agung, who Southworth described as clean and good looking for an Indonesian man. She testified that she moved away to Indianapolis with their daughter, Alea, in November 2005. (Alea was the daughter Southworth went to Cincinnati to pick up on the day his wife's body was found.) This evidence was offered under KRE 404(b) as proof that Southworth likely planted the semen found in Umi.

The jury found Southworth guilty of murder, and he was sentenced to life in prison. He now appeals to this Court as a matter of right. *See* Ky. Const. § 110(2)(b).

## II. Analysis

Southworth alleges six errors on appeal: (1) that the trial court erroneously admitted the testimony of Hesti Johnson in violation of KRE 404; (2) that the trial court allowed additional irrelevant evidence; (3) that the trial court should have granted a directed verdict of acquittal; (4) that the trial court should have granted a change of venue; (5) that the trial court erroneously excluded the testimony of a witness who would have testified to the distance and time of the drive from the Southworth home to UPS; and (6) that the trial court erroneously barred Southworth's expert witness from testifying about problems with several aspects of the police's forensic investigation. We address the issues out of the order raised, beginning with "the directed verdict claim because it could effectively result in an acquittal and thus render moot many if not all of the other issues." *Sluss v. Commonwealth*, 381 S.W.3d 215, 218 (Ky.2012).

### A. Southworth was not entitled to a directed verdict.

Southworth argues that he was entitled to a directed verdict of acquittal because the Commonwealth produced no more than a scintilla of evidence and showed no more than the possibility of wrongdoing. He also argues that the circumstantial nature of the proof was insufficient because the proof could also support his innocence, and that the trial court improperly allowed unreasonable inferences, including inferences to be built upon inferences, to support a guilty verdict. This Court disagrees on all three counts.

When presented with a motion for a directed verdict, "the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth," and "[i]f the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). The court "must assume that the evidence for the Commonwealth is true," *id.*, regardless of whether the evidence, usually testimony, has been attacked or impeached. The trial court is required to "reserv[e] to the jury questions as to the credibility and weight to be given to ... testimony." *Id.* On appellate review, the standard is deferential: a directed-verdict decision will be reversed only "if under the evidence as a whole, it would be *clearly* unreasonable for a jury to find guilt." *Id.* (emphasis added). This clearly-unreasonable standard requires "some deference" to the trial court's appraisal of the proof. *McCleery v. Commonwealth*, 410 S.W.3d 597, 601 (Ky.2013).

### 1. The Commonwealth produced more than a scintilla of proof.

The claim that the Commonwealth produced only a scintilla of proof is rebutted by the facts as recounted above. Admittedly, the proof against Southworth was not direct and consisted only of circumstantial proof. But direct proof of guilt is not necessary. Instead, the Commonwealth can prove all the elements of a crime by circumstantial evidence. *Commonwealth v. O'Conner*, 372 S.W.3d 855, 857 (Ky.2012). In this case, the circumstances pile up so that this Court cannot say that a jury would be clearly unreasonable in finding guilt.

The Commonwealth proved that Southworth had a controlling relationship with his wife and daughter and that his wife was about to divorce him and move to

another state. This is ample motive to commit the murder. Southworth's claims that the divorce was only on paper and that the relationship would continue do not require this Court to conclude there was no motive. The Commonwealth's proof must instead be presumed true and construed in favor of the Commonwealth. And the Commonwealth's evidence, such as that Umi had gotten the name of a lawyer and had opened secret accounts and safe-deposit boxes in her own name, suggested that the divorce was to be real, not just "on paper."

The Commonwealth also proved that Southworth had the opportunity to kill his wife. The forensic entomologist testified that Umi was likely killed before 3:15 a.m., when Southworth was still at home. That the proof showed it was *possible* she could have died later does not change this, as the proof must be viewed in the light most favorable to the Commonwealth. Additionally, the proof implies that Southworth scrambled to get an alibi, begging to go into work when he was already late for his shift despite being told that he did not have to come into work and that his shift had already been reassigned.

The jury also heard that a drop of Southworth's blood was found on Umi's nightdress, which was found near her body. There was also proof that clothes, including black leather shoes and some of Umi's underwear, had been washed on the "hot" setting and had not been taken out of the washer on the night of the murder. This proof suggested that Southworth was connected to Umi's death and may have tried to dispose of evidence.

And there was evidence that several items found at the crime scene were the same brand or type as those in the Southworth home. This further connected Southworth to the crime.

Some of the evidence, such as the belt loosely tied around Umi's neck that left no injury or mark, suggested a staged crime scene. The jury also heard that Southworth claimed to have looked under the mattress where his wife's body was found but did not see anything other than vines, which could easily be viewed as a falsehood, especially since he made this claim only after being confronted with the possibility of DNA evidence being found there, and had previously stated he only lifted the rug. From this, a jury could infer that Southworth had been at the crime scene, but for a criminal purpose.

The jury also heard other statements from Southworth that could be found to be lies or substantial inconsistencies, such as that Umi had a boyfriend (specifically, John DeGrazio, who denied any affair), that he did not know the name or phone number of the alleged boyfriend (though he later identified DeGrazio and had called him), and that she frequently walked the neighborhood talking on the phone (despite testimony from neighbors that they had never seen Umi walking late at night). From other statements by Southworth to police, such as that it was "good" that the police had not yet found Umi and his preemptive claim not to have killed her before the police informed him that she was dead, the jury could have inferred that he already knew she was dead. And his statement, when asked who might have hurt his wife, that one of the men in his apartment complex could not have hurt his wife because the man was gay could suggest that Southworth already knew that Umi had been left in a position suggesting a sexual assault. Also, Southworth's suggestion to police that his wife may have been out walking that night was undermined by testimony of other witnesses that there had been strong thunderstorms that night.

And the jury heard substantial proof about Southworth's other behavior after his wife's death, such as downplaying her disappearance and repeatedly stating she had a boyfriend. While this Court will not comment definitively on the character of that behavior, as that is the jury's job, the jury surely could conclude that it was unusual or unexpected and therefore evidence of a guilty mind.

This proof, taken as a whole and in the light most favorable to the Commonwealth, was sufficient to deny Southworth's motion for a directed verdict. A jury could reasonably conclude from these circumstances that Southworth was guilty. More importantly, this Court cannot say that a jury would have been *clearly* unreasonable in reaching a guilty verdict.

*2. The evidence did not present a scenario equally consistent with guilt and innocence.*

 Southworth's claim that the proof was as consistent with his innocence as it was his guilt is also incorrect. It is true that a conviction obtained by circumstantial evidence cannot be sustained "if [the evidence] is as consistent with innocence as with guilt." *Collinsworth v. Commonwealth*, 476 S.W.2d 201, 202 (Ky.1972). But that notion applies only when the evidence is viewed in the light most favorable to the Commonwealth and it still balances equally. If the evidence has to be viewed in different lights to be consistent with guilt and innocence, then the verdict is sustainable. The proof, when considered in the light most favorable to the Commonwealth, does not balance as perfectly as Southworth would have it, and only favors

him if the evidence overall is viewed in his favor.

Southworth suggests that the presence of unidentified semen in Umi is what makes this case balance so perfectly, noting that even the trial judge stated that this evidence was as consistent with consensual sex with an unidentified male as with being planted by Southworth. But this argument assumes that the Commonwealth *had* to show that Southworth planted the semen and that Umi had not had sex with someone else. While proving those could no doubt help the Commonwealth under its theory of the evidence, the Commonwealth's case would still stand even if the semen had come directly from another man. Indeed, such proof could further show Southworth's motive to kill his wife: that she was already having an affair. Showing that the semen had been manually placed simply was not essential to the Commonwealth's case, though it certainly was used at trial and was a core part of the Commonwealth's trial strategy.

*3. The Commonwealth's case was not built on unreasonable inferences or improper inferences upon inferences.*

 Finally, Southworth claims that all of the inferences described above are improper because they lack a strong connection to the underlying facts and are impermissible inferences upon inferences. In support of these claims, Southworth relies primarily on *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).[2] In that case, the Supreme Court stated that permissive inferences and presumptions, which it described as "evidentiary devices," are not unlimited. Instead,

---

**2.** Southworth also cites *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), though the quotation attributed to that case is actually from *Ulster County Court*. In fact, *Francis* is largely inapplicable to this case, as the main thrust of the opinion is to condemn mandatory inferences in jury instructions that "relieve the State of the burden of persuasion on an element of an offense." *Id.* at 314, 105 S.Ct. 1965. There is no issue concerning mandatory inferences in this case.

"the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Id.* at 156, 99 S.Ct. 2213.

First, it is not clear that *Ulster County Court* would apply here, as it is about the content of jury instructions, not the undirected, reasonable inferences that a jury makes while considering the evidence. Second, the case requires only that inferences be grounded in common sense and reason, *id.* at 172, 99 S.Ct. 2213, and common experience, *id.* at 171, 99 S.Ct. 2213.

Nothing suggests that the inferences the jury had to make to find guilt in this case are outside common experience, common sense, or reasonableness. Southworth points to inferences about the semen found in Umi as an example, claiming that the connection between the basic facts of the condom incident described by Hesti Johnson and the theory that Southworth planted semen on Umi to cover his crime consists of weak inferences. While this proof certainly has evidentiary problems, which are addressed below, that does not render the jury's verdict unreasonable. And as noted above, such proof was not even essential to the Commonwealth's case, representing, as it did, only one theory of the proof.

■ Southworth also cites Kentucky cases that he claims bar generally unreasonable inferences and inferences built on other inferences. No doubt, *unreasonable* inferences are barred by our law. Additionally, inferences cannot be drawn from other inferences drawn *ad infinitum. See, e.g., Briner v. General Motors Corp.,* 461 S.W.2d 99, 102 (Ky.1970). This is known as "the inference-upon-inference principle," *id.,* and it is condemned because "it raises the specter of speculation," *id.* In-

deed, mere speculation or conjecture has never been a sufficient basis for a jury verdict. *See, e.g., Sutton's Adm'r v. Louisville & N.R. Co.,* 168 Ky. 81, 181 S.W. 938, 940 (1916).

■ Admittedly, this Court's predecessor stated at one time in a criminal case that "[t]he jury may not in determining the facts base an inference upon an inference." *Pengleton v. Commonwealth,* 294 Ky. 484, 172 S.W.2d 52, 53 (1943); *see also id.* ("When an inference is based on a fact, that fact must be clearly established and if the existence of such a fact depends upon a prior inference no subsequent inferences can legitimately be based upon it."). But this "rule" cannot bar all inferences based on other inferences, despite being stated in absolute terms. If that were the case, then the exercise of logic, which frequently employs inference-derived inferences, would not be allowed to the jury. But logic, like common sense, "must not be a stranger in the house of the law." *Cantrell v. Kentucky Unemployment Ins. Commission,* 450 S.W.2d 235, 237 (Ky. 1970). Indeed, the law requires logical, reasonable inferences and decisions, rather than those driven by passion and emotion.

Thus, the so-called rule, stated in absolute terms, has been roundly criticized, as exemplified by the following:

> There is no such orthodox rule; nor can there be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder that the defendant's gun is found discharged. From this we infer that he discharged it, and from this we infer that it was his bullet that struck and killed the deceased. Or the defendant is shown to have been sharpening a knife. From this we argue that he had a design to use it upon the deceased, and from this we argue that the fatal stab was the

result of this design. In these and innumerable daily instances we built inference upon inference, and yet no court (until very modern times) ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials proceed upon such data. The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.

John Henry Wigmore & Peter Tillers, *Evidence in Trials at Common Law* § 41, at 1111 (rev. ed.1983). And in light of the criticism, "the modern trend is to abandon rules limiting the use of circumstantial evidence, *including an inference upon an inference.*" Eyal Zamir et al., *Seeing is Believing: The Anti–Inference Bias,* 89 Ind. L.J. 195, 199 (Winter 2014); *see also id.* at 200 ("the rule restricting an inference upon an inference has largely been abandoned").

And Kentucky has abandoned the absolute "rule," having replaced it with the inference-upon-inference "principle." *See Briner,* 461 S.W.2d at 102. As articulated in that case, the principle is intended to condemn inferences that build upon inferences in an unreasonable manner. For example, in *Klingenfus v. Dunaway,* 402 S.W.2d 844 (Ky.1966), in which liability was premised on an alleged defect in a tractor, the Court stated:

> What the appellee asks is that an inference be drawn that new bearings were ordered for this tractor; that another inference be drawn, upon the first one, that the tractor without the new bear-

ings was unsafe; and that a third inference then be drawn that the accident happened by reason of the previously inferred defective condition of the tractor. Such a pyramiding of inferences is not allowable.

*Id.* at 846.

■ But some inferences upon inferences are necessarily allowed. For example, in a criminal case, consciousness of guilt can be inferred from things like assumption of a false name after a crime, and, in turn, the "fact of guilt" can be inferred from the defendant's consciousness of guilt. *See Woodard v. Commonwealth,* 147 S.W.3d 63, 67 (Ky.2004); *see also* Wigmore & Tillers, *supra,* § 41, at 1111 (discussing examples of legitimate inferences upon inferences). Such a chain of reasoning would violate an absolute no-inferences-upon-inferences rule. But as long as an inference is grounded in common sense and experience, in reason and logic, and in the evidence at trial, it should be allowed and, indeed, embraced.

■ The real problem with Southworth's claim, however, is that he has not identified an unreasonable inference upon an inference through which the jury reached even one of the elements of the offense in this case, much less its guilty verdict as a whole. He again complains that the Commonwealth's theory that he inserted semen into his wife to cover his crime relies upon inferences upon inferences.[3] But again, the proof of the condom incident, while certainly making the guilty verdict easier for the jury to reach, and thereby affecting the verdict, was not essential to the Commonwealth's case. Even setting that proof aside, the Com-

---

**3.** While there is a logical gap, stemming from unreasonable inferences, with relation to the condom evidence, it goes to the admissibility of that evidence, as addressed below, and does not undermine the Commonwealth's case to such a degree as to require a *directed verdict* at that point of the trial, though it does require reversal. Additional testimony could possibly have made that evidence relevant.

monwealth still proved motive and opportunity, undermined Southworth's alibi, showed that Southworth likely told inconsistent stories (if not outright lies) during the investigation, and offered proof of arguably unusual behavior by Southworth after the crime. And, perhaps most damning, the Commonwealth proved that Umi likely died when Southworth was still at home and that his blood was found on her nightdress. These pieces of evidence did not require unreasonable inferences upon inferences for the jury to reach a guilty verdict.

## B. Testimony about the condom incident was improperly admitted.

■■■ Aside from its effect on the jury's inferences during deliberations, Southworth also objects to the introduction of the testimony from Hesti Johnson about the unusual incident involving a used condom. He maintains, as he argued at trial, that this evidence violates the prohibition on "[e]vidence of other crimes, wrongs, or acts" used "to prove the character of a person in order to show action in conformity therewith." KRE 404(b).

At trial, the Commonwealth offered this evidence to explain the presence of semen from someone other than Southworth in Umi, the theory being that Southworth had killed his wife and then staged the scene to look like a sexual assault or at least to show that his wife had sex with another man. The Commonwealth properly gave notice, as required by KRE 404(c), and argued that the testimony would show that Southworth was "capable of . . . planning and planting this type of evidence," and that it showed his "modus operandi."

Southworth objected to this evidence as impermissible evidence of other acts under KRE 404(b). He also asked for an evidentiary hearing at which Hesti Johnson's reliability would be addressed, along with the significance of some of the sperm found in Umi having had tails (i.e., whether it was inconsistent with the semen having been stored). At the non-evidentiary hearing on the motion, the Commonwealth argued primarily that the evidence—testimony about the placing of another man's semen into another person—was a signature act or *modus operandi* because it was so bizarre.[4]

The judge agreed with the Commonwealth and ruled from the bench that the evidence was admissible, stating that the conduct was "part of a signature."[5] The judge followed this up by stating that she was overruling the defense's request for an

---

4. The judge asked the prosecutor specifically if she was seeking to admit the evidence because it was similar to what was alleged in this case. The prosecutor said yes. When the judge asked how it could be similar enough if there was no evidence that a condom was used in this case, the prosecutor stated:

> Because the insertion of semen, in and of itself, is so bizarre, so unique, such a signature. How one does it, with or without a condom, I don't think matters in this case. If we hadn't tested for the condom matters, they would have said, you didn't test for the condom. But that doesn't mean we necessarily have, believe, would have believed that it was a condom. He inserted semen

in a person. That is a signature act that is bizarre and it shows that because he has the knowledge and capability to do that, he's done it before, it shows us he knows that, in and of itself, judge.

5. The complete ruling from the bench was as follows:

> I agree with the Commonwealth that the insertion of semen into another individual by means of a nonconsensual sexual encounter is so unique that I do consider it to be part of a signature. And I will allow the Commonwealth to allow Hesti to testify regarding her experience with Mr. Southworth involving the condom and the semen.

evidentiary hearing.[6]

■ As noted above, evidence of other crimes, wrongs, or acts cannot be used "to prove the character of a person in order to show action in conformity therewith." KRE 404(b). In other words, evidence of other acts cannot be used to show a propensity or predisposition to again commit the same or a similar act. This is a codification of the "venerable rule that a defendant may not be convicted on the basis of low character or criminal predisposition, *even though* such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense." *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky.1992).

Such evidence may be admissible, however, "[i]f offered for some other purpose" than mere propensity or criminal character. KRE 404(b)(1); *see also Billings*, 843 S.W.2d at 892 ("[E]vidence of criminal conduct other than that being tried is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character."). Permissible "other purposes" include "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," KRE 404(b)(1), though that list is not exhaustive.

■ Evidence of other acts carries a significant risk of prejudice to a defendant, however, even when offered for a proper purpose. For this reason, the rule is "strictly construed" and "has always been interpreted as exclusionary in nature." *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky.1994). And "trial courts must apply the rule cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime [or act [7]]." *Id.*

---

**6.** In a subsequent written order, the judge stated that Southworth's relationship with Johnson was "so inextricably intertwined with the [his] relationship with Umi Southworth, [sic] that it would be impossible for the Commonwealth to present a complete picture of the crime without introducing a portion of that evidence." The order then stated that Johnson would be allowed to testify about limited aspects of her relationship with Southworth and her time living with him and Umi, including "that in 2005 [Southworth] inserted another man's semen into Hesti's vagina by using a frozen condom which he had obtained from the trash." The Commonwealth has not argued on appeal that the condom testimony was inextricably intertwined with the other proof in the case, which would allow its admission under KRE 404(b)(2). But the simple fact is that the evidence was not so inextricably intertwined. Even assuming the remainder of Hesti Johnson's testimony was admissible, there is no reason the Commonwealth could not have avoided asking her about the condom incident. That testimony simply was not inextricably intertwined with the other proof at trial.

**7.** "KRE 404(b) applies to evidence of acts that are neither criminal nor unlawful, although it is most likely to be applied to criminal acts." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25[2], at 125 (4th ed.2003); *see also, e.g., Adkins v. Commonwealth*, 96 S.W.3d 779, 793 (Ky.2003). Thus, while the case law is usually concerned with other *crimes* of the defendant, in a case like this one, where the other act may simply be an unpleasant or unusual act, we must be mindful to apply the rule in the same way. Thus, the concern here is not that the testimony about the other act was used to directly prove that Southworth committed the crime of murder, but that it was used to prove that he committed a similar act in this case (placing another man's semen in his wife), which would indirectly support the Commonwealth's case by explaining away that evidence and inferences derivable from it (e.g., that Umi was sexually assaulted and murdered by someone other than Southworth). In other words, the concern is that the testimony tends to indirectly prove that Southworth committed the crime by undermining his defense that someone else did it. That,

To effectuate this strict approach, the Court has adopted a set of three inquiries—into "relevance, probativeness, and prejudice"—as "a useful framework for determining the admissibility of other crimes [or acts] evidence." *Id.* (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.25(II) (3d ed.1993)).

■ The first of these inquires, relevance, asks whether the proof is "evidence relevant for some purpose other than to prove the criminal disposition of the accused." *Id.* In essence, this inquiry requires a court to determine that the proof is being used for one of the "other purposes" allowed by KRE 404(b)(1). But the "other purpose" itself must be relevant, and the other-acts evidence must "be offered to prove material facts that are in actual dispute." Lawson, *supra,* § 2.25[3][b], at 127. For example, if the Commonwealth seeks to offer evidence that on the day of a murder, the defendant flourished a gun at a person other than the murder victim to show that the defendant had a gun, and the defendant freely admits possession of the gun, then the evidence is inadmissible. *See Arnett v. Commonwealth,* 470 S.W.2d 834, 837 (Ky.1971).

This is because "such evidence is not admissible unless the 'other purpose' allegedly justifying its admission is genuinely in dispute." Lawson, *supra,* § 2.25[3][b], at 127. If there is no question of fact that the other-acts evidence resolves, or if there is no proof sufficient to raise a question to be answered, then the other-acts evidence has no "relevance other than to

show the defendant's propensity to commit acts of violence." *Id.* The Court consequently agrees with Professor Lawson's statement that the rule "has undoubtedly embraced the notion that relevance for purposes other than propensity must be found in disputed issues." *Id.*

Under the relevance inquiry, the Commonwealth argues that the testimony "established [Southworth's] knowledge and skill in the practice of storing semen and inserting it into a woman's vagina."[8] Knowledge, of course, is one of the KRE 404(b) exceptions. The problem, however, is that Southworth's knowledge and skill in storing and inserting semen was not relevant to the case, or if it was, the Commonwealth failed to show that it was.

When used in this sense, "knowledge" really means proof of Southworth's ability or capacity to commit the act. But proof of such capacity has to be more than proof of a capacity shared by most people:

> Evidence of a person's capacity to commit the act would not often be relevant to show that the act was done or the actor's intent; hence, capacity would usually be offered to identify the defendant as the person who did the act. When offered on the issue of identity, the ability shown must not be one shared by the entire populace; e.g., evidence of a prior shoplifting offered to prove the defendant has the ability to steal. Rather the ability must be one that would serve to discriminate be-

---

however, is not an "other use," as it would be proof (albeit indirect) that Southworth acted in conformity with a prior act.

8. Southworth objects to this Court's even considering this claim, arguing that it is "a new theory of error ... raised for the first time on appeal." But the Commonwealth is not arguing a new error; rather, it is arguing a new theory in support of the trial court's ruling.

And "the judgment of a lower court can be affirmed for any reason in the record." *Fischer v. Fischer,* 348 S.W.3d 582, 591 (Ky. 2011). The Commonwealth referred to Southworth's knowledge and capability several times while arguing the admissibility of this testimony to the trial court. That is sufficient to allow this Court to consider the argument.

tween the defendant and other persons who might have committed the crime. 22A Charles A. Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5241 (2d ed., Supp.2012) (footnotes omitted).

The dissent is misguided in assuming that the proof was admissible to show that Southworth "had the unique capacity to stage a sexual assault." To reach this conclusion, the dissent cites cases in which a defendant's past acts demonstrated such "unique capacity." *See, e.g., United States v. Gessa,* 971 F.2d 1257 (6th Cir.1992); *People v. Thomas,* 2 Cal.4th 489, 7 Cal. Rptr.2d 199, 828 P.2d 101 (1992). But these cases are readily distinguished from the present case.

In *Gessa,* the court upheld the admission of the defendant's past acts of smuggling cocaine from the Bahamas to the United States to prove his participation in a conspiracy to smuggle an additional 2500 kilograms from the Bahamas. That evidence was admissible because it "was probative of 'intent, preparation, [or] plan,' because the prior excursions were probative of defendant's ability and opportunity to participate in an importation scheme." *Gessa,* 971 F.2d at 1262. Unlike in *Gessa,* nothing here suggests that the incident with Hesti showed Southworth's intent, preparation, or plan. Indeed, that act with Hesti occurred years before Umi was killed, and was presumably committed for an entirely different reason (artificial insemination or carrying out an unusual sexual desire) than the alleged act with Umi (staging a crime scene).

In *Thomas,* the court upheld the admissibility of the defendant's having successfully stalked people in the past, specifically, by "sneak[ing] up on people and then sneak[ing] away without their ever being aware of his presence." *Thomas,* 7 Cal. Rptr.2d 199, 828 P.2d at 116. This proof

was admissible because it showed that the "defendant, having previously been seen talking with the victims, could later have come upon them unawares with his rifle." *Id.* The court also stated: "The manner in which the killer came into contact with the victims was unknown; that defendant was capable of doing so without their awareness was certainly relevant to show opportunity." *Id.* 7 Cal.Rptr.2d 199, 828 P.2d at 117. This proof showed that the defendant had an uncommon skill—the ability to sneak up on people undetected. Again, there is nothing special or unique in the knowledge that Hesti's testimony supposedly showed that Donald had. Stealing a used condom from another person's trash and storing it in a refrigerator or freezer for future use requires no special skill or knowledge.

These cases differ from the present case because they obviously involve a unique capacity, skill, or knowledge of the defendant, or show an opportunity to commit the crime unavailable to other people. That has not been shown here. The proof would at most show that Southworth had obvious knowledge common to most people.

If showing any kind of knowledge is sufficient to meet KRE 404(b), then the rule would eat itself. All proof of other acts shows some amount of knowledge of how to do the act. But the knowledge in question must have more of a connection to the present case or risk making all other-acts proof admissible. The defendant's knowledge must prove some fact at issue in the case. Proof that Southworth had previously stolen, stored, and manually placed semen demonstrates nothing more than obvious knowledge.

Another reason this evidence is not admissible is that it requires proof of the fact that this was the method used to put the semen in Umi's body. This is the neces-

sary condition making this evidence relevant at all. When "the relevancy of evidence depends upon the fulfillment of a condition of fact," it is inadmissible if there is no "evidence sufficient to support a finding of the fulfillment of the condition." KRE 104(b). Southworth's knowledge of handling and storing semen could be relevant *only* if the semen was placed in Umi by unusual means (i.e., not by sexual intercourse, consensual or otherwise). This, of course, could be proved in numerous ways. For example, an expert might be able to testify that physical characteristics of the semen show that it had been stored before being placed in Umi, which would suggest that someone had placed the semen in Umi, perhaps to cover up a crime.[9] (Interestingly, Southworth wanted an evidentiary hearing to address this exact notion.) With such proof, the identity of the person planting the semen would become a genuine issue in the case and make proof of that identity relevant. (Of course, at least one witness suggested that some of the physical evidence did not show that a condom had been used (e.g., lack of silicone or other lubricants).)

But if the semen was not placed in Umi by unusual means, and was in fact deposited by natural means (i.e., sexual intercourse with the person producing the semen), or if the proof fails to show such an unusual placement, then Southworth's knowledge of how to store and handle another man's semen would have absolutely no bearing on this case. His knowledge would not be relevant because there would be nothing in the case for him to have knowledge about. By admitting such proof, the trial court allowed the Common-

wealth to admit obviously prejudicial proof that Southworth had previously committed an unusual sexual act without first proving that such an act had occurred in this case.

In short, Southworth's knowledge was at best conditionally relevant. The condition of fact (that the semen was manually placed in Umi) necessary to make his knowledge relevant had not been shown, nor did the Commonwealth intend to show that fact. Instead, it intended to bootstrap that evidentiary fact into existence by showing that Southworth had previously done a similar act. But that has the order of proof backwards.

■ When the relevance of an item of evidence or testimony turns on the occurrence of an act, the existence of which is also at issue, there must first be proof that the act occurred. For example, consider a case in which a defendant is on trial for murder, and the Commonwealth seeks to admit proof of the defendant's familiarity with and knowledge of guns. This Court has held that such evidence falls under the KRE 404(b) knowledge exception. *See Meece v. Commonwealth*, 348 S.W.3d 627, 663 (Ky.2011) (allowing such evidence in case where victims were murdered by gunshots). But what if the Commonwealth offers no proof of how the murder occurred? What if there is no proof of the cause of death at all? Without proof of the cause of death, then the scenario is equally as consistent with death by natural causes as a murder of some type. Setting aside the fact that a directed verdict would likely be granted in such a case, the Commonwealth would not be allowed to offer proof of the defendant's gun knowledge because

---

**9.** As another example, the proof could show the presence of an intact but inside-out condom near the crime scene, which would suggest that the condom had been used to transport and deposit the semen, rather than simply as a contraceptive. We express no opinion on precisely what proof is necessary to make this predicate showing, as it would depend upon the facts and circumstances of a given case. It suffices to recognize that there often are many ways of proving a given fact.

it would not be relevant without proof first that the death was caused by a gunshot.

In this case, the Commonwealth offered no proof that the semen was placed in Umi by means other than sexual intercourse with the man who produced the semen. The Commonwealth suggests that its failure to uncover an actual affair between Umi and someone other than her husband (despite his suggestions otherwise to police) implies that the semen was not present naturally. But that is an absence of proof (or possibly proof of an insufficient investigation by police), not actual proof that Umi did not have an affair. At trial, the Commonwealth also argued that the lack of evidence of condom use, such as lubricants, does not mean that a condom was not used to transport and insert semen; but that also does not mean that a condom *was* so used. There is an absence of evidence either way. Without more proof one way or the other, the presence of semen was a neutral fact.

Instead of proving the condition precedent that would make Southworth's knowledge relevant, the Commonwealth's approach to this proof simply *assumes* that the semen found in Umi was placed by someone in a manner outside the usual course of such a placement (i.e., sexual intercourse).[10] The Commonwealth is unknowingly engaging in question begging,

that is, assuming the answer to a question at issue. That requires an inferential leap that is not permitted by our law, namely, that the condom testimony can show that Southworth also placed semen inside Umi, even though there is no proof that the semen was manually placed, and is therefore relevant. This would allow the proof to admit itself by its bootstraps. Otherwise, the Commonwealth would be allowed to elevate its theory that the semen was manually inserted into Umi to the level of evidence to justify the admission of other conditionally relevant evidence. But a theory is no substitute for facts and must, instead, be based on facts, which in turn must be shown by evidence.

■■■ The Commonwealth's theory at trial that this proof showed a *modus operandi* or signature fails for the same reason. In this case, the *modus operandi* testimony would be offered to prove the identity of the person who placed the semen in Umi. But identity would not be relevant unless there was first proof that the semen had been manually placed in Umi and was not deposited in her by means of sexual intercourse with the person who produced the semen. The simple fact is that absent some proof about how the semen got there, the only reasonable inference is that it got there the natural

---

10. The dissent claims the proof that would allow an inference by the jury that the scene was staged generally or staged to emulate a sexual assault also shows that the semen was also staged, which would make the 404(b) evidence relevant. But this additional inference does not follow from the other inferences. That the semen was deposited manually would border on the type of inference upon an inference that actually is improper, as discussed above. It would be a fact "inferred without proof," 31A C.J.S. *Evidence* § 210 (updated Dec. 2013), and the next "fact," that Southworth must have been the person to manually place the semen, would

be an improper "inference drawn from the fact thus assumed," *id.*

There are, in fact, numerous theories that would account for the presence of the semen. For example, Umi could have had sex with another man earlier in the day (thus accounting for the semen). Southworth himself claimed she had a boyfriend. While he eventually claimed the boyfriend was John Degrazio, who was not a match for the semen, it is possible that Southworth was mistaken. Indeed, this would have given Southworth an additional motive to kill her if he found out about it.

way. Anything else, without additional proof, is pure speculation.

This case is similar in some ways to *O'Bryan v. Commonwealth*, 634 S.W.2d 153 (Ky.1982). In that case, the defendant had lived with a man who died of chronic arsenic poisoning. Years later, she lived with another man who also died of chronic arsenic poisoning. The Commonwealth sought to admit evidence of the death of the first man as part of a common scheme or plan, which would now fall under the "plan" exception in KRE 404(b)(1). The Court ruled that the proof was inadmissible because it was "not ... evidence of a crime because technically speaking, there is no evidence that a crime was committed." *Id.* at 156. The Court explained that there was no connection between the defendant and the previous act:

> The most that can be said is that [the first man] died of arsenic poisoning. No one knows who administered the poison. Although not likely, it could have been self-administered. No one knows whether the giving (or taking) of the arsenic was done purposefully, negligently, or accidentally. The poison could have entered [the first man's] body by way of several possible sources and means.

*Id.*

This case presents the converse in that the failed connection was to the act alleged at trial. While there is ample proof in this case that Southworth put semen in Hesti, there was a failure to make an evidentiary connection with the allegation that semen had been artificially placed in Umi in order to connect Southworth's prior act. Simply put, just as there was no evidence in *O'Bryan* that the first death was an "other crime," there is, in this case, no evidence that an "other act" led to the semen being in Umi. Without evidence showing that connection, "it would take a quantum leap of fact and logic to say that this [other-act] evidence was" relevant and admissible. *Id.*

Additionally, because the proof was offered as *modus operandi*, there must be proof that the *modus operandi* was involved in the subsequent act. For example, if a defendant had on two occasions robbed banks while wearing a Richard Nixon mask, proof of that fact would not be admissible at a trial for a third bank robbery unless there was proof that a similar mask was worn in that robbery. If no mask or a wholly different kind of mask (such as a balaclava) was worn in the third robbery, then the defendant's *modus operandi* would not be relevant.

If the proof in this case is to be considered *modus operandi*, then there must be such similarity between the proof offered and the facts at trial that the identity of the defendant can be determined from the similarities. The only common feature between Hesti and Umi is that both presumably ended up with semen in their bodies that was not Southworth's. The semen in Hesti's body was placed there by Southworth from a used condom. She testified to the various parts of that act, which are admittedly unique. But as to Umi, the only *fact* is that there was semen in her body that did not belong to Southworth. There is *no evidence* to indicate that it got in her body the same way the semen got into Hesti's body. To connect the presence of semen in Umi's body with Southwork committing all the steps he did to Hesti is rampant speculation. The proof required to link Southworth's prior conduct must be more than a mere possibility. There are not enough additional facts to identify Southworth as the one who put another man's semen in Umi sufficient to identify him as having done so.

In short, the Commonwealth offered proof of Southworth's knowledge or *modus*

*operandi* to show that he committed an act (manually placing semen) without first offering any proof that the act occurred. By so doing, the Commonwealth sought to admit the KRE 404(b) evidence on something that was not yet an issue in the case. As noted above, the other, non-predisposition purpose that KRE 404(b) proof is offered for must itself be relevant and at issue in the trial. The Commonwealth failed to show that the other purpose— Southworth's knowledge or *modus operandi*—was relevant because it failed to offer any proof of the factual condition necessary to make it relevant. That left the proof "without any relevance other than to show the defendant's propensity to commit [the uncharged] acts." Lawson, *supra,* § 2.25[3][b], at 127. As such, it was used only for a purpose forbidden by the rule, to show propensity, and its admission was therefore error.

The question, then, is whether that error could be harmless under Criminal Rule 9.24. This Court has read that rule to mean that a "non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth,* 283 S.W.3d 678, 688–89 (Ky.2009) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). "The inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.' " *Id.* at 689 (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239, alteration in original).

Rule 404(b) evidence is, by its very nature, extremely prejudicial. That is why the rule requires jumping through so many hoops before such proof may be admitted. While the proof in this case was not necessarily of another crime, though the jury could easily have perceived it to be a sexual assault, it was nonetheless prejudicial. Along with this testimony, Hesti also gave other background testimony about her relationship with Southworth, including that he impregnated her and married her while still married to Umi. This proof painted a picture of Southworth as a dominating sexual pervert.

Additionally, the Commonwealth emphasized the condom incident in closing as part of its overall theory that the crime scene had been staged to look like a sexual assault. In fact, the prosecutor went so far as to suggest that Hesti Johnson's testimony was *essential* to the case in this respect, stating:

> Now what about this semen? What about it? I don't know how he did it. I don't know how he got the semen in her. But he did it. *And that is why Hesti is so important. Think about what kind of case we would have if Hesti didn't tell us about her experience.* He put a used condom inside of her. You saw her describe it. She didn't want to describe it. Hesti was important because it showed that he had done it before, he knew how to do it, and it is a reasonable inference from that fact that he did it in this case. And again, he did it to try to set up a scene to try to make it look like something it's not. No evidence of trauma indicative of sexual assault. Sure, we understand, it doesn't always happen. But there wasn't any.

(Emphasis added.)

Regardless of whether it was essential to the Commonwealth's case, "[t]he prejudicial nature of this evidence cannot be denied." *O'Bryan,* 634 S.W.2d at 157. "While the evidence concerning the [condom incident] might make an interesting

novel or television play, the prejudice to appellant caused by the admission of such evidence cannot be allowed in a court of law." *Id.* The prejudicial and inflammatory nature of the testimony is undeniable. This Court concludes that this proof had a "substantial influence" on the jury or, at the very least, we are "left in grave doubt" that it did not. *Winstead,* 283 S.W.3d at 689. For that reason, "the conviction cannot stand." *Id.*

Though this Court must reverse Southworth's conviction, this is not to say that upon retrial the Commonwealth cannot show the relevancy of this proof to justify its admission. With additional proof, that hurdle could be overcome, though the trial court would have to engage in the full set of KRE 404(b) inquiries as set out in *Bell* and as described above.

## C. Other Issues

As noted above, Southworth has raised four other issues. Technically speaking, the other issues are moot because we are reversing the conviction for the KRE 404(b) error described above. *See Osborne v. Keeney,* 399 S.W.3d 1, 13 (Ky. 2012). Nevertheless, we will address them to the extent they are likely to recur at retrial, and guidance from this Court would be valuable. *Id.*

With this standard in mind, this Court declines to address three of the four issues: Southworth's claim that he was entitled to a change of venue, his claim that the trial court improperly excluded the testimony of Saul Grasso, and his claim that the trial court improperly limited the testimony of a defense expert witness.

A change-of-venue decision is a product of its time. Even if a change of venue might have been appropriate at the first trial, it might not be now. The passage of time since the trial and initial coverage may have reduced the effect of any pre-trial publicity so that a fair jury could be seated upon retrial. Similarly, while publicity may not have tainted the first trial, a change of venue might nonetheless be called for now or when retrial occurs, since more coverage of the conviction and this appeal may have occurred that could tip the balance. There is no guarantee that the facts surrounding publicity will be the same at retrial. At the same time, the legal standards for deciding when to change venue are well established. For those reasons, analysis of the past venue motion is not appropriate at this time.

Saul Grasso was barred from testifying because he violated the rule on separation of witnesses, KRE 615, by being present during one day of testimony during the first trial. Presumably, he will not be present for any testimony prior to his own at a second trial.

And it is unlikely that the defense will try to call the same expert witness, Brent Turvey, who proposed to testify about failings in the police's collection and forensic analysis of evidence. The trial court ruled that Turvey could testify to areas within his expertise, but limited his proposed testimony as to some of the issues. The defense ultimately chose not to call Turvey at all. After the trial court's hearing on Turvey, the Commonwealth obtained proof that some of his claimed qualifications, such as that he had been a police detective and had been employed in a specific jurisdiction in Alaska, were false. Though Southworth now claims that he did not call Turvey because of the limits on his proposed testimony, his trial counsel admitted that the decision was driven in part by the possibility that the Commonwealth would be able to impeach the expert because of this new information. Indeed, there was a pending motion to be able to impeach Turvey, and Southworth's counsel announced the defense would not call Turvey before

the trial court could rule on the motion. It is likely that Southworth would employ a different expert, or would choose to employ Turvey in a different manner on retrial. Because of this impeachment danger, this Court will not address the issues raised.

That leaves the final issue: Southworth's claim that the Commonwealth introduced a substantial amount of irrelevant testimony through various witnesses. Specifically, he complains about the following:

1) Nin Nin Sutardjo testified that she was a close friend of Umi's; that she originally thought Hesti Johnson was just Almira's baby sitter but later found out that she was Southworth's second wife; that at one point in 2004, Umi had come to her house for three days and cried; that in 2005, Johnson had run away from Southworth; and that Umi was scared before her death.

2) Patti Williams, the wife of Buck Williams who testified about Umi's intended move to Nashville, testified that the Southworths had driven to Nashville in separate cars and that Umi was shocked and afraid. The defense objected to this, and the judge sustained the objection.

3) Krista Melanich, a waitress who had waited on the Southworths on June 8, 2010 and other occasions, testified that Umi did not talk much and seemed distant on that last night, and that Southworth did not look at her much, and seemed agitated and in a hurry.

4) Jennifer Fowler, an assistant to Buck Williams (Almira's producer), testified about Southworth's treatment of Umi on two visits to Nashville. On the first, when she had offered to move a chair up to the table for Umi, Southworth had said Umi could instead sit in the back. On the second, Umi was on crutches but Southworth said that she could nevertheless help clean up after the meeting. She testified, over objection, that Southworth made it clear that he believed women were inferior.

5) Amy Sheik, one of Umi's friends in Lexington until moving away in 2005, testified that she was told that Hesti Johnson was Southworth's second wife and that Umi had given her a key to a safe deposit box and asked her to keep it secret.

6) Hesti Johnson testified as described above, including that she had a sexual relationship with Southworth, became pregnant with his child, and married him in a religious ceremony; and that she slept in Almira's room on a mattress and did the housework in the Southworth home.

7) WiWi Harrison, a restaurant owner and friend of Umi, testified that Umi frequently talked to her about her problems and Almira's music career; that Umi was quiet around Southworth but would talk more when she was by herself, that in the last several months before her death, Umi would visit Harrison's restaurant by herself every day; and that when Umi was injured in a car accident and having trouble walking, Southworth did not help her out of the car and into the restaurant.

8) Jeff Jacobs, an employee of Central Bank, testified that Umi had opened and closed several accounts in her name after July 12, 2002, and had the statements sent to her office.

9) John Weece, a pastor at Southland Christian Church, testified that he had one telephone conversation and several in-person meetings with

Southworth about a performance by Almira at the church; that he was very "gung ho" about Almira's music career;[11] that he wanted to be on stage when Almira performed so he could see her (despite the difficulty in doing this because of security concerns); that he did not want Almira hanging out in the "green room" with other musicians; and that when Southworth left to get coffee "there was a visible sign of joy from Almira especially."

10) John DeGrazio testified that he had met the Southworths in person a few times; that in September 2009 he received a hysterical call from Umi; that Umi had been in a car accident and did not communicate with him as much afterward; that Umi was shy and would not look anyone in the eye when Southworth was around. He also read into the record an email dated December 6, 2009, in which Southworth said that he did not know why Umi would say he was angry, had not found divorce papers, and was not angry.

Southworth claims that much of this evidence is improper because it does not show that he killed her and was thus irrelevant and prejudicial. But evidence does not have to relate directly to the crime to be relevant and admissible. Rather, the proof need only increase or decrease the probability that a fact at issue is true or not. *See* KRE 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). And relevant evidence is by default admissible at trial. *See* KRE 402 ("All relevant evi-

dence is admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky. Evidence which is not relevant is not admissible."). This Court cannot say that this testimony is categorically irrelevant and therefore inadmissible.

 A great deal of the testimony related, directly or indirectly, to whether Southworth was a controlling presence in Umi's and Almira's lives, either because of his conduct (e.g., bringing a second "wife" into the household, micro managing Almira's career), or because of Umi's behavior when in his presence (shy, not making eye contact) or out of it (more outgoing, involved in Almira's career). Southworth's exertion of control was proof of a motive for killing Umi, at least when combined with proof that she was divorcing him and moving with Almira to Nashville. If he was controlling and was about to lose that control, then he had a motive to act. That makes the testimony relevant, especially given that he denied even having a motive and denied having killed his wife. *See, e.g., Davis v. Commonwealth,* 147 S.W.3d 709, 725 (Ky.2004) (noting that the need for evidence proving motive is greatest and relevance is clearest when defense is denial of a criminal act); *see also People v. Fisher,* 449 Mich. 441, 537 N.W.2d 577, 582 (1995) ("In cases ... in which the proofs are circumstantial and the only witness is the accused, evidence of motive would be highly relevant.").

The proof also went to whether there was discord in the Southworths' relationship. It seems to go without saying that

---

**11.** Some of this testimony, such as that Southworth was "gung ho" was actually elicited on cross-examination by Southworth's counsel.

evidence of marital discord is relevant as evidence of motive. Indeed, this Court cannot find one of its own decisions expressly stating that proposition. But the analysis of the Michigan Supreme Court in *People v. Fisher* is persuasive:

> Evidence of marital discord is relevant to motive just as evidence of marital harmony would be relevant to show lack of motive. Discord or lack of discord in an ongoing relationship obviously has some tendency to make the existence of a fact in controversy more or less probable—whether or not the accused ended the relationship as it is alleged he did. Whether the marital discord is of a type that would provide a motive for murder is an issue of weight, not admissibility.

*Fisher*, 537 N.W.2d at 583; *cf. Bratcher v. Commonwealth*, 151 S.W.3d 332, 350 (Ky.2004) (noting proof related to defendant's affair admissible as proof of motive).

That it does not automatically follow that Southworth would kill his wife to keep control over his daughter's career, or to avoid losing control over Umi, or because of general marital discord does not make the evidence irrelevant. Rather, such a consideration goes to the weight of the evidence, which is for the jury to decide, not the court.

■ Other portions of this testimony related to Umi's acting secretly with regard to money, such as by setting up new accounts and having the statements sent to her office and her secret safe-deposit box. This proof also went to motive, since it undermined Southworth's claim that all was well at home and that he was fine with the divorce and upcoming move. It suggests that Umi intended to make a cleaner break than Southworth would admit, and that the divorce would be more than simply "on paper." This further shows motive, as it shows that Umi intended to escape from Southworth's control of both

herself and her daughter. In fact, this testimony buttressed the other control testimony, since it shows that Umi felt controlled and that she needed to act in secret.

Though the testimony was no doubt duplicative in some places, the testimony of multiple witnesses from different parts of the Southworths' lives was appropriate to provide a full picture of Donald Southworth's controlling conduct, Umi's submissive behavior, and eventually that Umi was acting in secret, specifically with regard to money. To the extent that prejudice might have arisen from the avalanche of proof, this Court is confident that on retrial the trial court can exercise its discretion in weighing the probativeness of the proof against its undue prejudice or danger of confusion under KRE 403.

This is not to say that all of the testimony would be admissible on retrial. As noted above, the trial court sustained Southworth's objection as to some of the evidence, and such a decision would be appropriate on retrial if the relevance and probativeness analysis dictates inadmissibility. But this Court cannot, at this point, go line by line to analyze the admissibility of each and every statement. It is sufficient to address broadly Southworth's claim that these entire categories of testimony were irrelevant and overly prejudicial, as we have done above. And it is possible that the proof will follow a slightly different path upon retrial, which will require admissibility decisions to be made in that new context, taking into account the circumstances of the retrial. This Court again trusts that the trial court can undertake this process without step-by-step guidance from this Court.

### III. Conclusion

Southworth was not entitled to a directed verdict of acquittal, and therefore may

be retried. But the admission of the other-acts evidence of the condom incident was error under KRE 404(b) given the Commonwealth's failure to establish proof of the factual condition necessary to make it relevant. This error prejudiced Southworth and was not harmless. For that reason, his conviction is reversed, and this case is remanded to the trial court for further proceedings as may be necessary, which may include a new trial.

All sitting. Minton, C.J.; Abramson, Keller and Venters, JJ., concur. Scott, J., concurs in part and dissents in part by separate opinion in which Cunningham, J., joins.

SCOTT, J., Concurring in Part and Dissenting in Part:

I agree with the majority's opinion in all respects except for its reversal of Appellant's conviction on the grounds that Hesti Johnson's testimony regarding the used condom incident was irrelevant and, therefore, inadmissible. I would affirm the trial court in this regard as well. I would do so because I believe that Johnson's testimony as to Appellant's unusual act of using a condom to transfer and insert another man's semen into her vagina was properly admitted as circumstantial other-acts evidence because it could have established a peculiar capacity or "signature event" on the part of Appellant to falsify the appearance of a sex crime. This signature event was highly relevant in a case where independent evidence suggested that the crime scene was, in fact, "staged" to look like a sexual assault.

Case law recognizes that prior bad acts may be introduced at trial for the "other purpose" of proving that the defendant possessed the capacity to commit the charged crime. *See, e.g., United States v. Maravilla*, 907 F.2d 216, 222 (1st Cir. 1990); *United States v. Green*, 648 F.2d 587, 592 (9th Cir.1981). If it can be established that a defendant possessed the capacity to commit a particular crime, the likelihood that the defendant perpetrated the crime increases. 22A Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5241 (3d ed.1998). In other words, evidence of a defendant's unique abilities or traits may be admitted to prove the identity of the defendant as the perpetrator of a crime requiring those abilities. *See, e.g., United States v. Gessa*, 971 F.2d 1257, 1261–62 (6th Cir.1992) (finding that Appellant's ability to smuggle cocaine in the past was admissible to establish his identity as drug importer); *People v. Thomas*, 2 Cal.4th 489, 7 Cal.Rptr.2d 199, 828 P.2d 101, 116–17 (1992) (approving use of "stalking" evidence to show defendant had the ability to stealthily approach people even though no showing was made that the killer sneaked up on his victims).

In this case, the crime committed was murder, and additional evidence suggested that the crime scene was "staged" to appear as though a sexual assault occurred. In fact, part of the reason the majority upheld the trial court's denial of Appellant's directed verdict request was because "[s]ome of the evidence, such as the belt loosely tied around Umi's neck that left no injury or mark, suggested a staged crime scene." Furthermore, the majority opinion stated that the evidence presented at trial "could suggest that Southworth already knew that Umi had been left in a position suggesting a sexual assault." The Commonwealth also presented evidence that semen belonging to an unidentified man was discovered in Umi's vagina after the attack that killed her. The inference then must be that someone else was the attacker or the semen was inserted manually and the crime scene was "staged" as a sexual assault. Thus, the Commonwealth

must have an opportunity to use all the valid evidence it has to address the issue. Any evidence suggesting that Appellant had the unique capacity to stage a sexual assault would be relevant to identify him as the perpetrator of this crime. *See Gessa,* 971 F.2d at 1261–62; *Thomas,* 7 Cal. Rptr.2d 199, 828 P.2d at 116–17.

At trial, the Commonwealth offered Johnson's testimony to show that Appellant had previous experience manually transferring another man's semen into a woman's vagina. The testimony established Appellant's unique capacity to perform an act for which the most apparent purpose would be to make it appear as though a woman had sex with a particular man, when, in fact, she had not.

Looking at one interpretation of the evidence, we have a crime "staged" to look like a sexual assault and evidence that Appellant, the husband of the victim, had experience manually transferring another man's semen into a woman's vagina, a capacity that is highly relevant to the "staging" of a sexual assault. Considering the complete context of the evidence presented at trial, I simply cannot agree with the majority's conclusion that Johnson's testimony regarding the condom incident lacked relevance simply because the Commonwealth failed to prove, as a condition precedent, that the semen found in the murder victim's vagina was actually placed there manually rather than through consensual sex. In my view, the majority takes too narrow a view of relevancy when this decision is one for the jury.

Although the prosecution could not prove that the semen was inserted into Umi through unnatural means, it was successful in proving that a married woman had semen in her vagina from a source other than her husband and that Appellant had the obvious capacity to stage a sexual assault. The peculiar actions of Appellant as revealed through Johnson's testimony—the use of a frozen condom to insert another man's semen into her vagina—are evidence that he was creating the appearance that Johnson had sex with another man either as part of an aborted effort to kill her or that he was honing the technique for future use. In any event, it is an act of signature status.

Either way, Appellant's ability to perform an act most people would be unwilling to do, however, or unable to even think up, differentiates him from other persons who may have committed the crime and it should be admissible as circumstantial evidence of Appellant's identity as perpetrator of the murder. *See United States v. Hooshmand,* 931 F.2d 725 (11th Cir.1991) (explaining that capacity differs from propensity because Appellant's knowledge or ability is not common to everyone, thus, it differentiates the defendant from other persons who might have committed the crime).

For the foregoing reasons, I believe that Johnson's testimony regarding the used condom incident was relevant and that the trial court did not abuse its discretion in allowing it. Therefore, I would uphold Appellant's conviction and life sentence. In my view, the jury was properly allowed to consider the testimony for what it was worth. Notably, they convicted. Thus, I respectfully dissent.

CUNNINGHAM, J., joins.