# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: FEBRUARY 15, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

## 2022-SC-0465-MR

JOHN C. UPTON                                            APPELLANT

|   |   |
|---|---|
| V. | ON APPEAL FROM GREEN CIRCUIT COURT<br>HONORABLE SAMUEL TODD SPALDING, JUDGE<br>NO. 22-CR-00026 |

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING IN PART, VACATING IN PART, AND REMANDING**

In 2019, the Kentucky General Assembly made strangulation a separate offense within Kentucky Revised Statutes (KRS) Chapter 508, Assault and Related Offenses. 2019 Ky. Acts ch. 183, § 2 (eff. June 27, 2019).[1] This case raises the issue of whether the Commonwealth met its burden and proved beyond a reasonable doubt that Appellant John C. Upton (Upton) committed that crime. Particularly, the question is whether the Commonwealth proved beyond a reasonable doubt that Upton impeded R.D.'s[2] normal breathing. Considering the evidence at trial, we must agree with Upton that the

---

[1] At the time of Appellant's indictment, the statute had been in effect almost three years.

[2] Initials are used to protect the privacy of the female victims mentioned in this case.

Commonwealth did not meet its burden. We further conclude that the trial court improperly allowed the jury to consider KRE[3] 404(b) prior bad acts evidence. However, that error was harmless, and Upton's fourth-degree assault under extreme emotional disturbance and second-degree unlawful imprisonment convictions are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2021, R.D., Upton's girlfriend, and her minor daughter, A.L., were at Upton's Green County residence when he came in from work. A.L., who had been napping, heard Upton and R.D. arguing. Using her cell phone, A.L. recorded part of the argument and sent it to her father who lived in Barren County. When A.L. did not respond to her father's question as to whether the argument was currently happening, her father called the police. Kentucky State Trooper Mattingly was dispatched to Upton's home and arrived about 6:35 p.m.

Upton greeted Trooper Mattingly and the two spoke on the carport. Upton admitted that he had been drinking and had a verbal altercation with R.D. Trooper Mattingly informed Upton that he was going inside to check on the occupants. They both went into the residence. Upton yelled for R.D. to come upstairs from the basement. While he was yelling for her to come upstairs, Upton went downstairs to get R.D. R.D. came upstairs, but Upton did not.

---

[3] Kentucky Rule of Evidence.

Trooper Mattingly asked Upton to come back upstairs, but did not get a response. A.D., R.D.'s son who had received a message from A.L. to pick her up, came into the home about that time. Trooper Mattingly escorted A.D. out of the residence, back to his car, and called for backup. When Trooper Mattingly returned to the residence, R.D. was in the living room and Upton was still downstairs. Trooper Mattingly again yelled for Upton to come upstairs. When Upton complied, the trooper detained him and put him in the back of the cruiser.

Greensburg police arrived on the scene. While the Greensburg police talked with Upton, Trooper Mattingly interviewed R.D. At one point, Trooper Mattingly stopped the interview and obtained a device to record R.D.'s statement. Trooper Mattingly also took photos of R.D.'s neck. According to the recorded statement, R.D. told Trooper Mattingly that Upton kept her downstairs and would not let her have her phone.

Upton was indicted on charges of first-degree strangulation, fourth-degree assault (third or more domestic charge in less than five years), first-degree unlawful imprisonment, first-degree wanton endangerment, and being a first-degree persistent felony offender (PFO I). The first-degree strangulation charge was based upon allegations that Upton put his hand on R.D.'s throat and impeded her normal breathing. The fourth-degree assault charge was based upon allegations that Upton pushed R.D. into the bathroom, grabbed her chin, picked her up, and jerked her downstairs. The first-degree unlawful imprisonment charge was based upon allegations that Upton grabbed R.D. by

3

her chin and forced her into the basement until arrival of the law enforcement officer, and the restraint occurred under circumstances which exposed R.D. to a risk of serious physical injury. The first-degree wanton endangerment charge was based upon R.D.'s daughter being near the assault while it was occurring; the trial court granted a directed verdict in Upton's favor on this charge. At trial, R.D. largely denied that Upton acted in the way the Commonwealth alleged. Trooper Mattingly testified that R.D.'s testimony was inconsistent with the statement she gave to him on December 8, 2021. The Commonwealth played R.D.'s recorded statement for the jury.

Over Upton's pretrial and trial objections, the trial court ruled that the Commonwealth could introduce KRE 404(b) evidence stemming from Upton's prior relationships. The jury heard K.F.'s testimony about two incidents, one in January 2017 and another in November 2017. The jury also heard J.V.'s testimony about an incident in July 2021.

K.F. testified that on January 9, 2017, at which point she was about 6-7 months pregnant,[4] she told Upton that she wanted to stay home but she knew that wasn't going to be acceptable. K.F. placed a board across her sliding back door. She went to her bedroom, locked the door, and fell asleep. Upton managed to get through both doors. Upton was angry; he didn't understand why she did not want to hang out. Then, K.F.'s phone lit up, and reflected a communication from another male. K.F. testified that Upton snapped, and

---

[4] During K.F.'s cross-examination, it was clarified that K.F. was not pregnant with Upton's child.

4

that he got on top of her and choked her. After she managed to calm Upton down, they were still arguing, and sitting on the side of the bed. She decided to get out of the situation by faking going into labor. Upton took her to the hospital. K.F. told hospital personnel that she was in danger and needed to get away from Upton. The Kentucky State Police responded to the call. K.F. testified that she had visible marks around her neck.

On November 26, 2017, before going and while at a local restaurant, K.F. and Upton were arguing. When they got up to leave, Upton told her not to talk or look at anyone. He held her by her arm as they walked out. They were still arguing when they returned to Upton's house. K.F. testified that Upton ended up choking her, slamming her head into the wall, and that he put a belt around her neck and tightened it; K.F. testified that she was also pregnant at this time. The Commonwealth asked if Upton kept her from leaving, if he restrained her movement where she couldn't leave, and if he took her phone. K.F. testified that Upton took her phone and wouldn't let her use it, but she was able to get it back and sent her mom a text, telling her to call the police because she thought Upton was going to kill her. Greenburg police responded.

K.F. also testified about her conversation with Upton, following the incident with R.D. According to K.F.'s testimony, Upton told her that he and R.D. were arguing; he grabbed R.D.'s face because she was not looking at him; and he screamed and told R.D. to look at him. Upton also told K.F. that he wouldn't let R.D. come up the stairs; Upton put his hands in front of the doorway and would not let R.D. get passed him.

5

J.V. testified about a July 2021 incident at Upton's residence. She and Upton were sitting in the living room and he noticed a car driving by multiple times. He grabbed his gun, went outside after the car, saying that he was going to kill the driver. J.V. ran after him and screamed for Upton to return to the house. Upton returned and asked J.V. about the car. J.V. sent a text to a friend who verified that she had been driving by; the friend did not recognize J.V.'s car in the driveway and was suspicious about Upton having another girlfriend. When J.V. decided to leave, Upton cornered her at the bathroom, and put his fist up like he was going to hit her. J.V. covered her face and Upton stopped and hit himself in the face, instead. J.V. and Upton ended up in the living room, the situation escalated a little bit, and after a while, finally stopped.

The Commonwealth asked J.V. if she was able to leave and J.V. responded, "Eventually." The Commonwealth also asked J.V. if Upton took her phone, if she was unable to use it. J.V. responded that her phone ended up under the television and she thought Upton threw it there; on cross-examination when asked about being deprived of her phone, J.V. testified that she knew the telephone was under the television the whole time but she could not get it. J.V. testified that she eventually got the phone back.

After the trial court granted Upton's directed verdict motion on the wanton endangerment charge, the jury found him guilty of second-degree strangulation, second-degree unlawful imprisonment, fourth-degree assault under extreme emotional disturbance (EED), and being a PFO I. The trial court

6

followed the jury's recommendation and sentenced Upton to twenty years in prison, a PFO I enhanced sentence for committing second-degree strangulation;[5] and imposed fines for committing second-degree unlawful imprisonment and fourth-degree assault under extreme emotional disturbance. This appeal followed.

Additional facts are set forth below as necessary.

## ANALYSIS

Upton argues that he was denied a fair trial because the trial court allowed the jury to consider unduly prejudicial testimony under Kentucky Rule of Evidence (KRE) 404(b) and failed to direct a verdict in his favor when the Commonwealth presented no evidence to prove one element of strangulation. We begin the analysis with the directed verdict claim.

## I. UPTON WAS ENTITLED TO A DIRECTED VERDICT ON THE STRANGULATION CHARGE

Upton argues that the Commonwealth failed to prove beyond a reasonable doubt one element of the crime of strangulation. Particularly, Upton argues that the Commonwealth failed to prove beyond a reasonable doubt that he impeded R.D.'s normal breathing. The Commonwealth argues that the jury, when considering R.D.'s recorded statement and Trooper Mattingly's testimony, could reasonably infer that Upton impeded R.D.'s breathing.

---

[5] Prior to the enhancement, the jury recommended Upton serve five (5) years in prison.

7

## A. The Evidence

At trial, the Commonwealth played Trooper Mattingly's recorded interview with R.D. at the scene. According to R.D., Upton came in from work "in a mood" and she agreed with him that maybe he should go back to work. The jury heard R.D. explain that Upton "pushed [her] into the bathroom," "grabbed [her] by [the] chin," and following a radio interruption, that Upton "kinda picked [her] up," and then jerked her down the stairs. Trooper Mattingly then testified about the interview and quoted R.D.'s statements from the interview. Trooper Mattingly further testified that R.D. had given him that account more than once and that after hearing R.D.'s account, he looked to see if there were injuries and took some photographs. The photographs, which Trooper Mattingly described as not being the best, were displayed on a video screen for the jury to view. Trooper Mattingly described that on R.D.'s left side, on the collarbone, there was "like a scratch . . . like it had rubbed, an area had rubbed." He also noted that there was a mark directly under R.D.'s earring "in line right by that." Trooper Mattingly also described that on the right side, around the same area as the left side, looking straight down from the ear, there was a red mark. Hard copies of the photographs were presented to Trooper Mattingly, and he marked the areas noted. The photographs were introduced into evidence.

Trooper Mattingly testified that when he saw the marks, he believed that they were consistent with someone being grabbed around the neck. He explained that when one grabs another around the neck, the person's thumb

8

goes underneath one ear and the middle finger and index finger go under the other ear. Trooper Mattingly agreed with the Commonwealth that there was a statement by R.D. about Upton "lifting her up." On cross-examination, Trooper Mattingly agreed that in R.D.'s recorded statement, R.D. never told him that Upton put his hand on her neck and testified that based upon his training, he believed the red marks on R.D.'s neck were from someone's hand as it was implied from R.D.'s report that she was "picked up" and then jerked downstairs, and that he never asked R.D. whether the red marks were related. Trooper Mattingly also testified that he never asked R.D. if anything was done to cut off her ability to breathe.

In addition to the jury hearing R.D.'s taped statement, the jury heard R.D.'s testimony about the events on December 8, 2021. She testified about Upton coming in from work, upset, and what she described as a verbal altercation, which occurred soon thereafter. R.D. described Upton as being very loud, and that she looked down, trying to ignore Upton, until he stopped yelling. R.D. explained that Upton told her that she did not respect him and to look at him, and she demonstrated that Upton grabbed her chin. R.D. further testified that she did not want to argue any further, and she suggested that she and her daughter would go home and come back after Upton cooled off. Nevertheless, R.D. went downstairs with Upton so that her daughter would not hear them argue. Upton eventually calmed down after ten to fifteen minutes of screaming, and about that time, Trooper Mattingly arrived.

9

R.D. testified that other than Upton grabbing her by the chin, which R.D. again demonstrated, Upton had never hit, grabbed, or pulled her. R.D. testified that she had reviewed her statement to Trooper Mattingly since the incident, but she did not recall the statement. R.D. stated that she would have described the sequence of events to Trooper Mattingly similarly to her in-court testimony. R.D. again recounted that Upton told her she was disrespectful to him and told her to look at him, and again demonstrated how Upton grabbed her chin. R.D. further testified that there was no pushing or shoving at that point and that she did not think that she told the trooper that there was. R.D. stated she did not recall what she told the officer in regard to being forcibly taken downstairs by Upton. She further stated that she did not know whether she was forced, but she walked with her own two feet and did not having any trouble getting down to the basement. When the Commonwealth questioned R.D. whether Upton had picked her up and carried her to the basement, R.D. responded, "Oh, God, no," and further responded that Upton did not jerk her or pull her down to the basement.

When defense counsel cross-examined R.D. and asked whether on December 8, 2021, Upton ever tried to put his hand around her neck, R.D. stated, "Absolutely not." When defense counsel also asked whether Upton ever impeded her ability to breathe, R.D. responded, "No." Defense counsel pointed out that she had noticed R.D.'s neck getting red while testifying, and R.D. explained that her neck gets red often, usually when she gets upset. R.D. testified that she had cried during her argument with Upton and was upset

10

when she spoke to Trooper Mattingly at the scene. R.D. also denied that Upton kept her downstairs.

After the close of the Commonwealth's case, defense counsel called R.D. as a witness. R.D. testified about the photos and the areas circled by Trooper Mattingly. She testified that she believed that the red mark on her collar bone was a blemish, a blemish she also believed was then present on her, and contemporaneously pulled her blouse to expose the area to the jury. R.D. also testified that the red mark near her left ear was also probably a blemish, or a mole (which she pointed to), and also probably then present on her neck. As to the right side of her neck, R.D. testified that she could not see any marks in the photo, but there was a shadow on her face. R.D. further testified that she did not tell the officer that she had marks on her and that the marks referenced in the photos were not in the area where Upton grabbed her face and were not near where his hands would have been. R.D. again demonstrated how Upton grabbed her chin, making her look up at him. In response to the Commonwealth's cross-examination questions, R.D. testified that she never told the officer that Upton "lifted" her up, and that Upton "did not grab [her] neck, or pick [her] up by her neck, [which] would have broken her neck." R.D. testified that she stated to the officer that Upton grabbed her chin.

### B. Motions for Directed Verdict and Judgment Notwithstanding the Verdict

At the close of the Commonwealth's evidence, defense counsel moved for a directed verdict on the strangulation charge. Defense counsel argued that there was no evidence that R.D.'s breathing was impeded — the officer did not

11

ask R.D. about her breathing during the interview and R.D. did not say during her testimony that her breathing was impeded. The Commonwealth argued that based on the red marks on R.D.'s neck and the obviousness that Upton would have been "lifting her up" in the neck area, that is exactly where Upton would have been pushing. The Commonwealth asserted that given the amount of pressure that it would take to lift an adult person, the proof supported a conclusion that Upton impeded R.D.'s breathing. The trial court considered whether, in connection with the officer's testimony about what he believed were red marks around R.D.'s neck, a reasonable jury could infer R.D.'s breathing was impeded based upon R.D.'s statements about Upton grabbing her in the neck, throat, chin area and being lifted off the ground and jerked down steps. The trial court overruled the directed-verdict motion and the renewed motion at the close of all evidence. As reflected within the trial order and judgment, the trial court concluded that a reasonable jury could find Trooper Mattingly's testimony persuasive and find Upton guilty of first-degree strangulation.

The jury was instructed on both first-degree and second-degree strangulation.[6] The instructions were identical except that each contained the appropriate mens rea.

---

[6] Under the fourth-degree assault and fourth-degree assault under extreme emotional disturbance instructions, the jury considered whether Upton "intentionally caused physical injury to [R.D.] by pushing her into the bathroom, grabbing her chin, picking her up, and jerking her downstairs." The jury found Upton guilty of fourth-degree assault under extreme emotional disturbance.

12

The second-degree strangulation instruction, under which the jury found Upton guilty, stated:

> [Y]ou will find [Upton] guilty of Second-Degree Strangulation . . . if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

> A. That in this county on or about December 8, 2021, and before the finding of this indictment herein, [Upton] wantonly impeded the normal breathing of [R.D.] by grabbing her throat;

>    AND

> B. That in so doing, [Upton] did not, and knew that he did not, have the consent of [R.D.].

Defense counsel moved for judgment notwithstanding the verdict on the second-degree strangulation charge. Defense counsel argued that viewing the evidence in the light most favorable to the Commonwealth, there was not any evidence put forth that any reasonable juror could have found beyond a reasonable doubt that R.D.'s breathing was impeded. Defense counsel again advocated that there was no witness testimony which indicated that R.D.'s breathing had been impeded and also that it could not be inferred that R.D.'s breathing was impeded based upon her recorded statement that Upton "grabbed her chin," "picked her up," and "drug her downstairs." The Commonwealth maintained its argument that based upon a finding that R.D. had red marks on her neck and that she stated that she was lifted up by her neck, a restriction of R.D.'s airway was a reasonable inference that that jury could make. The trial court concluded that under the directed verdict/JNOV standard, based upon R.D.'s statement at the scene, the jury could conclude

13

that R.D.'s breathing was impeded. The trial court denied Upton's motion for judgment notwithstanding the verdict.

### C. Analysis

A criminal defendant may only be found guilty of a crime if the evidence is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (citing *In re Winship*, 397 U.S. 358, 364 (1970)); *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002). Therefore, "if upon all the evidence, there is reasonable doubt whether a defendant was capable in law of committing the charged crime[,]" a defendant is entitled to an acquittal of that charge. *In re Winship*, 397 U.S. at 363 (quoting *Davis v. United States*, 160 U.S. 469, 484 (1895)). "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error." *Id.* The standard "operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions," *Jackson*, 443 U.S. at 315 (quoting *Winship*, 397 U.S. at 363), and "impress[es] upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself," *id.* (citing *Winship*, 397 U.S. at 372 (Harlan, J., concurring)).

To be convicted of committing the offense of strangulation, a person must "without consent, intentionally [(first degree, a Class C felony) or wantonly (second-degree, a Class D felony)] impede[] the normal breathing or

14

circulation of the blood of another person by: (a) [a]pplying pressure on the throat or neck of the other person; or (b) [b]locking the nose or mouth of the other person." KRS 508.170; KRS 508.175; 2019 Ky. Acts ch. 183, § 2 (eff. June 27, 2019). "When presented with a motion for a directed verdict, a court must consider the evidence as a whole, presume the Commonwealth's proof is true, draw all reasonable inferences in favor of the Commonwealth, and leave questions of weight and credibility to the jury." *Acosta v. Commonwealth*, 391 S.W.3d 809, 816 (Ky. 2013) (citing *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky. 1991)). A trial court should deny a directed verdict when the "Commonwealth has produced . . . more than a scintilla [of evidence] and it would be reasonable for the jury to return a verdict of guilty based on it[.]" *Id.* (citing *Benham*, 816 S.W.2d at 187–88). The standard is slightly more deferential when the denial of the directed verdict is reviewed on appeal; "then, the trial court should be reversed only if 'it would be *clearly unreasonable* for a jury to find guilt.'" *Id.* (quoting *Benham*, 816 S.W.2d at 187–88). The standard of review for denial of judgment notwithstanding the verdict is the same standard as that when reviewing denial of a directed verdict. *See Savage v. Three Rivers Med. Ctr.*, 390 S.W.3d 104, 112 (Ky. 2012).

*Anderson v. Commonwealth*, 352 S.W.3d 577, 581 (Ky. 2011), grounds the review of the evidence in this case. *Anderson* addressed the appellant's claim that there was insufficient proof to convict him of assault in the first degree under KRS 508.010. *Anderson* explained that KRS 508.010 set a "fairly strict level of proof which must be met by sufficient evidence," *id.* (quoting

15

*Prince v. Commonwealth*, 576 S.W.2d 244, 246 (Ky. App. 1979)), and that under KRS 508.010, the Commonwealth must prove the defendant caused a "serious physical injury" as defined within KRS 500.080(15), *id.* But furthermore, "[w]hen determining whether a defendant caused a 'serious physical injury,' the issue is not whether there was proof of an act that *could* cause 'serious physical injury.' The issue is whether there was proof of an act that *did,* in fact, cause 'serious physical injury.'" *Id.* (citing *Commonwealth v. Hocker,* 865 S.W.2d 323 Ky. 1993)). The *Anderson* Court concluded that the Commonwealth's evidence was insufficient to prove that the appellant caused a "serious physical injury" as defined by statute. *Id.* at 583. The Court recognized that "[s]lashing at someone's face and neck area with a straight razor certainly could cause 'serious physical injury.' [But again,] the question is not what *could* have happened, but rather what *did* happen." *Id.*

Here, the requirements of proof are no less. Like with KRS 508.010, the strangulation statutes set a "fairly strict level of proof which must be met by sufficient evidence." And consistent with *Anderson,* the issue here is not whether there was proof of an act that *could* cause normal breathing to be impeded, but whether there was proof of an act that *did* impede normal breathing.

In *Southworth v. Commonwealth,* 435 S.W.3d 32 (Ky. 2014), this Court discussed the role "inferences" play in jury decisions. In that case, the appellant was convicted of murdering his wife and argued on appeal that he was entitled to a directed verdict because the "circumstantial nature of the

16

proof" was insufficient; he argued that the proof could also support his innocence, and that the trial court improperly allowed unreasonable inferences to support a guilty verdict. *Id.* at 42. The Court considered the appellant's arguments that the inferences in his case were improper because they lacked a strong connection to the underlying facts and were impermissible inferences upon inferences. *Id.* at 44. The Court recognized that the proof against the appellant was not direct and consisted only of circumstantial proof but concluded that the circumstances piled up such that the Court could not say that a jury would be clearly unreasonable in finding guilt. *Id.* The Court stated:

> No doubt, *unreasonable* inferences are barred by our law. Additionally, inferences cannot be drawn from other inferences drawn *ad infinitum. See, e.g., Briner v. General Motors Corp.*, 461 S.W.2d 99, 102 (Ky. 1970). This is known as "the inference-upon-inference principle," *id.*, and it is condemned because "it raises the specter of speculation," *id.* Indeed, mere speculation or conjecture has never been a sufficient basis for a jury verdict. *See, e.g., Sutton's Adm'r v. Louisville & N.R. Co.*, 168 Ky. 81, 181 S.W. 938, 940 (1916).

*Id.* at 45.

This Court further recognized that "as long as an inference is grounded in common sense and experience, in reason and logic, and in the evidence at trial, it should be allowed and, indeed, embraced." *Id.* at 46. "Indeed, the law requires logical, reasonable inferences and decisions, rather than those driven by passion and emotion." *Id.* at 45.[7] But furthermore, as explained in *Moore v.*

---

[7] With regard to inferences and speculation, *Martin v. Commonwealth*,13 S.W.3d 232, 235 (Ky. 1999), further explains:

17

*Commonwealth,* "the failure to produce accurate and readily available evidence . . . forces the jurors deciding the issue to rely more heavily upon the arguments of counsel than on the evidence presented." 462 S.W.3d 378, 388 (Ky. 2015).

The *Southworth* Court concluded that "[n]othing suggests that the inferences the jury had to make to find guilt in this case are outside common experience, common sense, or reasonableness." 435 S.W.3d at 45. That is not the situation in this case. As noted above, in order for a defendant to be found guilty of strangulation under KRS 508.170 or KRS 508.175, the Commonwealth must prove that the defendant impeded the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person or by blocking the nose or mouth of the other person. Here, as reflected in the directed verdict arguments and the jury instruction, the Commonwealth sought to prove beyond a reasonable doubt that Upton impeded R.D.'s normal breathing by applying pressure on her throat.

The Commonwealth argued to the jury during closing argument that it was common sense that Upton impeded R.D.'s normal breathing. In line with

---

An inference is the act performed by the jury of inferring or reaching a conclusion from facts or premises in a logical manner so as to reach a conclusion. A reasonable inference is one in accordance with reason or sound thinking and within the bounds of common sense without regard to extremes or excess. It is a process of reasoning by which a proposition is deduced as a logical consequence from other facts already proven. Guesswork, on the other hand, is the process of making a judgment without adequate information, or to conjecture, or to speculate.

that argument, the Commonwealth Attorney performed a demonstration by putting her hand around her neck and encouraged the jurors to put their hand around their neck to determine the effect. The Commonwealth specifically argued that with R.D.'s statement that Upton "grabbed her by her *throat* and picked her up and jerked her down the steps," it is common sense that, in consideration of a person's sheer body weight, a person's normal breathing is impeded when that person is being picked up and jerked down the stairs. However, this statement and demonstration was not consistent with evidence presented.

Perhaps there are elements of common sense that a juror may rely on when asked to determine whether a person impeded the normal breathing of another person by applying pressure on the throat. For example, when a person testifies that they were choked and there is redness on the neck, it may involve an element of common sense that there was enough pressure to impede normal breathing. Here, without such accompanying testimony, the very limited evidence, viewed in the Commonwealth's favor, does not allow the jury to logically or reasonably infer that R.D.'s breathing was impeded. Instead, without the requisite evidence, the jury was left to rely on the Commonwealth's inaccurate descriptions that R.D. stated that she was lifted up by her neck and that R.D. stated that Upton grabbed her by her throat and picked her up. We are satisfied that an ordinary, reasonable juror could not "reasonably infer" from the evidence provided, to the point of proof beyond a reasonable doubt, that Upton impeded R.D.'s normal breathing.

19

To date, *Saxton v. Commonwealth*, 671 S.W.3d 1 (Ky. 2022), decided in December 2022, is the only case in which this Court has considered whether the trial court properly denied a directed verdict on a strangulation charge.[8] We concluded that the denial was proper. *Id.* at 11. The fact pattern in *Saxton* is significantly different than the facts in this case. In *Saxton*, the victim testified against Saxton. She testified that

> Saxton . . . grabbed her throat with his hand, squeezing, so that . . . she could not scream nor breathe. Saxton then released her, spun her around and locked her neck in his forearm, pinning her to the bed. Once more he squeezed. [She] . . . feared she would pass out. In desperation, she managed to bite Saxton on his arm, and he released her.

*Id.* at 6.

Considering the elements of first-degree strangulation and the definition of impede, this Court stated:

> Saxton's testimony that she could not breathe and that she felt she would pass out as a result of Saxton squeezing her neck with his hand and forearm easily satisfies the elements required by law

---

[8] Recently decided and not-yet-final *Johnson v. Commonwealth*, 2022-SC-0185-MR, 2023 WL 8639369 (Ky. Dec. 14, 2023), is a case in which the appellant was found guilty of two counts of first-degree strangulation, among other crimes. However, the appellant did not challenge the strangulation convictions. Regarding the first attack, "At some point, [the victim] confronted Johnson with her phone in her hand and Johnson took her phone, then grabbed [the victim] by the throat and lifted her off the ground. [The victim] could not breathe, and her vision started to blur." *Id.* at *1. Regarding the second attack, "Johnson admitted to slapping [the victim] and then restraining her from leaving the apartment by grabbing her around the neck, as she was going to get more cocaine. Johnson also admit[ted] [the victim] told him she couldn't breathe at which point he released her." *Id.* at *2. The victim was taken to the emergency room. *Id.* at *3. At trial, the emergency room doctor "testified to ligature marks on [the victim's] neck which, when he was informed she had urinated on herself at the scene, led him to conclude she had been strangled." *Id.* "Despite being treated in the hospital, [the victim's] injuries continued to get worse for a time. Her throat and larynx swelled to the point that her airway was closed, and she had to be intubated." *Id.*

20

thus, we find no error in the trial court's refusal to grant a directed verdict as a matter of law.

*Id.* at 11.

In its brief, the Commonwealth describes R.D.'s neck injuries as the best evidence of Upton's guilt. The Commonwealth posits that Trooper Mattingly's testimony established that Upton impeded R.D.'s circulation or breathing to the point of leaving obvious red marks on both sides of R.D.'s neck. The Commonwealth further argues that the evidence that Upton *lifted* R.D. up by the chin and the evidence that she had obvious neck injuries was more than sufficient for a jury to reasonably infer that Upton impeded R.D.'s breathing by applying pressure to her neck.

While the jury could reasonably infer from Trooper Mattingly's testimony that Upton grabbed R.D.'s neck, that alone does not support a finding that Upton impeded R.D.'s breathing. At trial, the Commonwealth described the evidence as evidence that Upton *lifted R.D. up by the neck*, giving the impression of R.D. being lifted off the ground, putting pressure on R.D.'s neck to the point her normal breathing was impeded. But Trooper Mattingly didn't even ask from where she was lifted, and R.D. denied that she was ever grabbed by the neck. While no doubt there are situations in which victims are lifted by their necks and their normal breathing is impeded,[9] it is an unreasonable inference based upon R.D.'s statement that Upton "kinda picked her up,"

---

[9] *See* note 8, *supra,* describing that scenario in *Johnson,* 2023 WL 8639369.

which did not provide any indication from where she was lifted, let alone that her breathing was impaired.

Thus, while the Commonwealth portrays R.D.'s statement as allowing the jury to fill in the blanks and conclude that R.D. experienced the kind of pressure on her neck from which it would necessarily follow that her normal breathing was impeded, logically, that is a step too far.  R.D.'s statement that Upton "grabbed her by the chin" and then "kinda picked her up" without more, such as some statement which indicated that she had difficulty breathing during that occurrence, is not sufficiently specific to allow a rational jury to reasonably infer — beyond a reasonable doubt — that Upton applied pressure on R.D.'s throat which impeded R.D.'s normal breathing.  *See* Dean A. Hawley, George E. McClane, & Gael B. Strack, *Review of 300 Attempted Strangulation Cases Part III: Injuries in Fatal Cases*, 21 J. Emerg. Med. 317, 320-21 (2001) (describing the factors which play a role in strangulation).  This is especially so when the victim of the assault specifically denies any strangulation element.

This Court is mindful of the research regarding domestic abuse victims and the life-threatening nature of strangulation, and its impetus for states to codify strangulation as a separate criminal offense.  *See* Carvana Cloud, *Investing as a Community: Analyzing Strangulation Cases & Implementing a MDT Strangulation Protocol to Reduce Domestic Violence Homicides*, 53-Jul Prosecutor 4 (July 2019); Kaley S. Chan, *Getting a Grip on Strangulation*, 2018-Oct. Army Law. 42 (Sept./Oct. 2018); Allison Turkel, *Understanding, Investigating and Prosecuting Strangulation Cases*, 41-Dec Prosecutor 20

22

(Nov./Dec. 2007). This Court is also mindful of the difficulties that law enforcement and prosecutors face when prosecuting an abuser without the support of the victim and the strategies that law enforcement agencies are developing to better prosecute strangulation cases. *See* Training Institute on Strangulation Prevention and California District Attorneys Association, *The Investigation and Prosecution of Strangulation Cases* (2013), https://www.strangulationtraininginstitute.com/wp-content/ uploads/2015/07/California-Strangulation-Manual_web3.pdf (last visited Dec. 21, 2023). Nevertheless, for conviction of strangulation here, due process for the accused requires proof of two very specific elements beyond a reasonable doubt: pressure to the neck and impedance of normal breathing. *See Anderson*, 352 S.W.3d at 583. As *Anderson* reminds us, a strangulation conviction cannot rest upon what could have happened, but what did happen. *Id.*

## II. ADMISSION OF TESTIMONY RELATED TO UPTON'S PRIOR BAD ACTS WAS HARMLESS ERROR AS TO THE ASSAULT AND UNLAWFUL IMPRISONMENT CONVICTIONS

Upton brings KRE 404(b) claims of error related to prior bad acts with J.V. and K.F.,[10] two of Upton's former girlfriends. These claims are preserved.[11] He argues that J.V.'s and K.F.'s testimony should not have been

---

[10] It appears that during 2017, the victim's initials would not have been K.F. For consistency, she is referred to as K.F.

[11] Upton complains on appeal that the August 26, 2022 notice pertaining to K.F. was not timely because trial was scheduled to begin on August 29, 2022 and the motion was heard the morning of trial. Because this issue is not preserved and Upton

admitted because the testimony was not reasonably related to the charges being tried and the testimony inflamed the jury, resulting in the conviction. Upton seeks a new trial. When the admission of KRE 404(b) evidence is challenged on appeal, we review the trial court's decision for abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007). Abuse of discretion occurs when the decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

The Commonwealth gave KRE 404(b) notice of its intention to use the facts and circumstances of incidents involving J.V., an uncharged incident, and K.F., two charged incidents, to show a pattern of conduct/modus operandi for domestic assault and false imprisonment. Pertinent to R.D.'s testimony that Upton did not act as alleged by the Commonwealth and commit the crimes of which he was accused, modus operandi evidence may be admitted to prove the "*corpus delicti*—whether the event occurred at all." *See Dickerson v. Commonwealth*, 174 S.W.3d 451, 469 (Ky. 2005) (quoting *Billings v. Commonwealth*, 843 S.W.2d 890, 892-93 (Ky. 1992)). The Commonwealth's motions were supported by a crime supplement narrative (J.V.)[12] and citations

does not request palpable error review, we decline to consider it. *See Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008).

[12] In July 2022, J.V. gave a statement to police about an incident at Upton's residence which occurred in July 2021, five months before Upton's incident with R.D. According to the officer's crime supplement narrative, J.V. described Upton as paranoid that J.V. may have cheated on him while she was on vacation and about a black car which kept going by the residence. J.V. reported Upton began an altercation with her, pushing her against a wall, and pushing her down at one point. J.V. said that Upton had a gun and pointed it at her face during the altercation. She also

24

(K.F.).[13],[14]  The trial court overruled Upton's pretrial and trial objections and allowed J.V. and K.F. to testify.

The Commonwealth proffered that J.V. would testify that Upton became enraged with J.V., refused to let her leave the residence, shoved her down, took her cellphone, and did not allow her to call the police.  The Commonwealth argued that these facts of J.V.'s incident with Upton are strikingly similar to the allegations involving R.D. in this case: i.e., Upton grabbed R.D.'s throat, pushed her against the wall, forced her into the basement, and took her phone.

---

reported that Upton grabbed her phone and threw it, and told her she could not leave. J.V. said Upton eventually calmed down.

[13] In January 2017 and November 2017, Upton was charged with crimes related to conduct against K.F.  The January 2017 citation stated, in pertinent part, that Upton broke into K.F.'s residence and entered her locked bedroom.  A verbal altercation turned into a physical altercation.  K.F. stated that Upton made physical contact with her, putting his hands around her neck while stating that he was going to kill her.  The officer reported observing visible marks around K.F.'s neck.

The November 2017 citation stated, in pertinent part, that Upton and K.F. had been arguing while at a local restaurant and Upton held her by the upper right arm and forced her out of the store and into his vehicle.  The officer reported K.F. had a red mark consistent with the description she gave.  K.F. explained that when they got to Upton's residence, he was still very angry and took her phone refusing to allow her to use it.  K.F. also explained that during the incident, Upton repeatedly placed his hands around her throat, placed a belt around her neck/throat and tightened it and hit her head into the wall.  After about an hour, she was able to pacify Upton enough so that he allowed her to use her phone.  K.F. sent her mother a text message to call 911 for her, relaying that Upton was going to kill her and not to reply to the message. The officer reported that upon his arrival, no one answered the door and a short time later K.F. walked to the front yard of the residence and advised him that Upton told her not to go to the front door and she was able to leave through the rear basement door.

[14] In relation to the January 9, 2017 incident, Upton pled guilty to first-degree criminal trespass; third-degree terroristic threatening; and fourth-degree assault, domestic violence, minor injury.  *Commonwealth v. Upton*, No. 17-M-00008 (Green Dist. Ct., Jul. 17, 2017).

In relation to the November 26, 2017 incident, Upton pled guilty to fourth-degree assault, domestic violence, third or subsequent offense within five years. *Commonwealth v. Upton*, No. 18-CR-00009 (Green Cir. Ct., May 2, 2018).

25

The trial court agreed. The trial court ruled, however, that the allegation that Upton pointed a gun at J.V.'s face was markedly different than the allegations in this case and was inadmissible because the prejudicial effect of such evidence would outweigh its probative value.

The Commonwealth proffered that K.F. would testify that a verbal altercation turned into a physical altercation when Upton placed his hands around K.F.'s neck leaving visible red marks. The Commonwealth argued that the facts were similar to the facts in this case; i.e., the domestic assault allegedly began with a verbal altercation, but then escalated into Upton grabbing R.D. with his hands around her chin and neck and shoving her into the bathroom before he drug her down the steps where he restrained her from leaving. The Commonwealth argued that with regard to the allegations that Upton falsely imprisoned R.D., comparably, K.F. explained to the officer that she had been restrained for approximately an hour before she "pacified" him enough to get her phone and send a text to her mother.

The trial court concluded that the January 9, 2017 and November 26, 2017 incidents involving K.F. and Upton were strikingly similar to the allegations in the indictment in this case and agreed with the Commonwealth that the incidents were not too remote to be considered by the jury.

On appeal, Upton argues that J.V.'s and K.F.'s testimony should not have been allowed. He argues that as to both J.V. and K.F., the prior bad acts were unrelated and dissimilar to the acts he allegedly made against R.D.; and as to K.F., the prior bad acts were also too remote to be relevant. The

26

Commonwealth disagrees. However, the Commonwealth contends that if the trial court erred by allowing the Commonwealth to introduce the KRE 404(b) evidence, the error was harmless because the evidence of guilt was strong. That is, the Commonwealth introduced photographic evidence depicting red marks on R.D.'s neck, and her initial statement to Trooper Mattingly explaining how Upton grabbed her by the chin, "lifted her up," and jerked her downstairs. And furthermore, the trial court specifically instructed the jurors that they could consider the KRE 404(b) evidence as is it related to the Commonwealth's claim of intent and pattern of conduct and not for any other purpose.[15]

KRE 404(b) guards against entry of evidence of a defendant's previous bad actions which "show a propensity or predisposition to again commit the same or a similar act." *Southworth*, 435 S.W.3d at 48; *see Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004). "Ordinarily, [evidence of the commission of other crimes] does not tend to establish the commission of the crime. It tends instead to influence the jury, and the resulting prejudice often outweighs its probative value." *O'Bryan v. Commonwealth*, 634 S.W.2d 153,

---

[15] The instruction stated:

> You have heard testimony that John Chess Upton is alleged to have committed acts other than those charged in the Indictment involving [J.V.] and [K.F.] on or about January 9, 2017; November 26, 2017; middle of July, 2021; and November 30, 2021. If you find John Chess Upton did these acts, you can consider the evidence only as it relates to the Commonwealth's claim of the Defendant's intent and pattern of conduct. You must not consider it for any other purpose. Remember, John Chess Upton is only on trial for the acts which allegedly occurred on or about December 8, 2021, not for other acts. Do not return a guilty verdict unless the Commonwealth proves beyond a reasonable doubt the crimes charged in the indictment.

156 (Ky. 1982). "Generally, a defendant's prior bad acts are inadmissible because '[u]ltimate fairness mandates that an accused be tried only for the particular crime for which he is charged. An accused is entitled to be tried for one offense at a time, and evidence must be confined to that offense. . . . The rule is based on the fundamental demands of justice and fair play.'" *Clark*, 223 S.W.3d at 96 (quoting *O'Bryan*, 634 S.W.2d at 156). KRE 404(b), however, does allow evidence of criminal conduct other than that being tried if it is probative of an issue independent of character or criminal disposition, such as those listed in the rule's exceptions, *see id.* ("Among the non-enumerated exceptions we have recognized to KRE 404(b)'s general prohibition on the introduction of prior bad acts evidence is . . . modus operandi."), and it meets the KRE 403 balancing test, *see Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994); *English*, 993 S.W.2d at 945. The exceptions "should be closely watched and strictly enforced because of the dangerous quality and prejudicial consequences of this kind of evidence." *O'Bryan*, 634 S.W.2d at 156 (citing *Jones v. Commonwealth*, 303 Ky. 666, 198 S.W.2d 969 (1947)).

KRE 404(b)(1) states in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible . . . [i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In relation to the Commonwealth's proposal to use Upton's prior bad acts to establish a modus operandi, in *Billings*, 843 S.W.2d at 893, this Court

explained that while "modus operandi" is not specifically mentioned within KRE 404(b)'s list of exceptions, this Court has long held that evidence of prior bad acts which are extraordinarily similar to the crimes charged may be admitted to demonstrate a modus operandi for the purposes of proving, *inter alia*, identity.

> The relevance of *modus operandi* evidence is based upon the simple logical precept that begins with this premise: One can reasonably infer that two strikingly similar crimes were probably committed by the same person. That means that the identity of an unknown perpetrator can be inferred by the striking similarity between his crime and a different crime committed by a known perpetrator. Therefore, if we know the identity of the person who committed one of the crimes, we can infer that *that* person committed the other strikingly similar crime.

*Graves v. Commonwealth*, 384 S.W.3d 144, 150 (Ky. 2012).

While the relevance of modus operandi evidence may be based upon a simple logical precept, our case law has recognized that the principle is not so easily applied. *See Billings*, 843 S.W.2d at 892-93; *Clark*, 223 S.W.3d at 97. For example, in *Billings*, 843 S.W.2d at 893, the Court concluded that the holding in *Lantrip v. Commonwealth*, 713 S.W.2d 816 (Ky. 1986), was nearest the mark in regard to how bad acts evidence offered to prove the *corpus delicti* by similarity should be assessed. The *Billings* Court expressed that for such cases when the *corpus delicti* is at issue, it was appropriate "for purposes of assessing the admissibility of evidence of collateral crimes . . . to treat the evidence as if offered to prove identity by similarity, and to require that the details of the charged and uncharged acts be sufficiently similar as to demonstrate a modus operandi" using the following standard:

29

> In every case in which evidence of other crimes is sought to be introduced to establish a pattern or scheme, the real question is whether the method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person. If it does so, evidence that the defendant committed the other crime is admissible. If it only tends to show a disposition to commit a crime, the evidence is not admissible.

843 S.W.2d at 893 (quoting *Adcock v. Commonwealth*, 702 S.W.2d 440, 443 (Ky. 1986)). *Billings* further stated:

> In cases of this nature, we have long recognized that the degree of similarity between the charged and the uncharged acts is a critical factor in establishing a direct relationship independent of character. As the degree of similarity increases, and a modus operandi appears, inferences are more likely to be drawn from the events' common *facts* rather than their common *criminality.*

*Id.* at 892 (footnote omitted).

*Clark v. Commonwealth* added further clarity to the criteria for judging when the Commonwealth may introduce prior bad acts under the modus operandi exception. *Clark* explained that

> as a prerequisite to the admissibility of prior bad acts evidence, we now require the proponent of the evidence to "demonstrate that there is a factual commonality between the prior bad act and the charged conduct that is simultaneously similar and so peculiar or distinct that there is a reasonable probability that the two crimes were committed by the same individual." Thus, "[a]lthough it is not required that the facts be identical in all respects, 'evidence of other acts of sexual deviance . . . must be so similar to the crime on trial as to constitute a so-called signature crime.'"

223 S.W.3d at 97 (internal citations omitted). Stated another way, "[t]he modus operandi exception requires acts that mark the crime as that of a specific person who may be unknown until caught, but who is identified by the distinctive nature of his or her acts." *Woodlee v. Commonwealth*, 306 S.W.3d

30

461, 465 (Ky. 2010). In that regard, "[c]onduct that serves to satisfy the statutory elements of an offense will not suffice to meet the modus operandi exception." *Clark*, 223 S.W.3d at 98. Instead, such conduct will satisfy the exception only if it evidences such a distinctive pattern as to rise to the level of a signature crime. *Id.*

To summarize, then, if the conduct which meets the statutory elements does not reveal a distinct, peculiar pattern so as to rise to a signature crime, the question is, beyond the conduct which meets the statutory elements, what other similarities exist between the events surrounding the defendant's alleged criminal conduct and his other prior bad acts. If other similarities exist, are they such that the defendant's conduct across the incidents identify a distinct, peculiar pattern necessary to qualify for the modus operandi exception. *Id.* at 98. With this standard in mind, we turn to Upton's claim that J.V.'s and K.F.'s testimony was bad character evidence offered to show Upton's conformity therewith and did not fall within the modus operandi or other KRE 404(b) exceptions, and assess the similarities and differences across the incidents. *See id.* at 99.

The Commonwealth, similar to its pretrial and trial arguments, offers that based on J.V.'s allegations, J.V. and Upton got into an altercation during which Upton pushed J.V. against a wall, pushed her down, took her phone, and would not let her leave. And in comparison, as alleged in this case, Upton and R.D. got into an altercation during which Upton grabbed her chin, kind of picked her up, jerked her down into the basement, wouldn't let R.D. have her

31

phone, and kept her downstairs. The Commonwealth contends the Upton's misconduct with J.V. was strikingly similar to the charges in this case.

First, although uncharged as to J.V., conduct of pushing, and then taking a phone and not allowing a person to leave is conduct which serves to satisfy the statutory elements of the assault and unlawful imprisonment, respectively. Consequently, in order for this conduct to be sufficient for establishing the modus operandi exception, the particular manner of assaulting or unlawfully imprisoning J.V. and R.D. must be so peculiar or distinct to show modus operandi. Here, we disagree with the trial court's application of this principle in the case. The similarities noted by the Commonwealth, as well as the similarities in the surrounding circumstances, i.e., emotional states leading to arguments which evolve into physical altercations, are not so distinctive or peculiar so as to create a method of operation unique to Upton. Instead, they seem to reflect circumstances common across abusive relationships involving physical violence. And furthermore, J.V.'s allegation that Upton pointed a gun at her head during the incident is a notable difference which must be considered in the modus operandi analysis. Consequently, we conclude that Upton's conduct toward J.V. did not satisfy the modus operandi exception.

As to K.F., the Commonwealth offers that the underlying facts of Upton's two prior convictions involving K.F. are eerily similar to the charged offenses in this case. The Commonwealth points out that on January 9, 2017, Upton broke into K.F.'s residence and put his hands around her neck, stating he was

32

going to kill her. On November 26, 2017, Upton took K.F.'s phone, restrained her for approximately an hour, and repeatedly placed his hands around her throat. For comparison, the Commonwealth states that in this case, Upton grabbed R.D. by the chin, "lifted her up," and jerked her down the stairs, causing obvious neck injuries that were consistent with being grabbed there.

Like with J.V., the conduct which the Commonwealth relies upon in regard to K.F. is conduct which serves to satisfy statutory elements, but with K.F., that includes assault, unlawful imprisonment, and strangulation. Neither the bad acts or the surrounding circumstances afford a finding of peculiarity or distinctiveness for the crimes or incidents. And in terms of differences, Upton's placement and tightening of the belt around K.F.'s neck and beating K.F.'s head against the wall are differences which must be considered the analysis. We conclude that Upton's conduct toward K.F. did not satisfy the modus operandi exception.

Since we have previously concluded that Upton was entitled to a directed verdict on the strangulation charge, we must consider whether the error of improperly admitting the KRE 404(b) evidence was harmless as to Upton's assault and unlawful imprisonment convictions. "A non-constitutional evidentiary error may be deemed harmless . . . if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009). Here, there was ample evidence, including R.D.'s recorded statement, the trooper's testimony, and K.F.'s testimony about Upton's admissions as to his treatment

33

of R.D., to support the jury finding Upton guilty of fourth-degree assault under extreme emotional disturbance[16] and second-degree unlawful imprisonment.[17] We can conclude with fair assurance that the verdict of the jury was not substantially swayed by the improper admission of the KRE 404(b) evidence.[18]

## CONCLUSION

Because the Commonwealth failed to prove beyond a reasonable doubt that Upton impeded R.D.'s normal breathing, Upton was entitled to a directed verdict on the strangulation charge. Consequently, Upton's conviction for second-degree strangulation is vacated. As to the improper entry of the KRE 404(b) evidence, we conclude that error was harmless. Upton's convictions for fourth-degree assault under extreme emotional disturbance and second-degree

---

[16] *See* note 6, *supra* (describing fourth-degree assault jury instruction).

[17] "A person is guilty of unlawful imprisonment in the first degree when he knowingly and unlawfully restrains another person under circumstances which expose that person to a risk of serious physical injury." KRS 509.020(1). "A person is guilty of unlawful imprisonment in the second degree when he knowingly and unlawfully restrains another person." KRS 509.030(1). The first– and second– degree unlawful imprisonment jury instructions were the same except that the first-degree instruction contained an instruction pertaining to the serious physical injury element. The jury was instructed to find Upton guilty of first-degree unlawful imprisonment if:

 A. [Upton] restrained R.D. by grabbing her by the chin and forcing her into the basement of his residence until the arrival of law enforcement; AND

 B. That [Upton] did so knowingly without the consent of [R.D.] AND

 C. That the restraint occurred under circumstances which exposed [R.D.] to a risk of serious physical injury.

[18] Upton also claims on appeal that the trial court erred by failing to allow defense counsel to effectively cross examine K.F. regarding the KRE 404(b) incidents related to strangulation. Because we have determined that Upton was entitled to a directed verdict on the strangulation charge, we need not and do not address this claim of error.

34

unlawful imprisonment are affirmed. This case is remanded to the Green Circuit Court for further proceedings not inconsistent with this opinion.

All sitting. Conley, Keller, Lambert and Thompson, JJ., concur. VanMeter, C.J., concurs in part and dissents in part by separate opinion in which Bisig and Nickell, JJ., join.

VANMETER, C.J., CONCURRING IN PART AND DISSENTING IN PART: Respectfully, I must dissent from so much of the majority as holds the strangulation charge against Upton should have been dismissed upon directed verdict. Although this is an admittedly close case, the Commonwealth introduced a sufficient amount of evidence to overcome Upton's motion for a directed verdict. Our directed verdict standard is stringent and to succeed on such a motion a defendant must meet a high bar:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Campbell v. Commonwealth*, 671 S.W.3d 153, 163 (Ky. 2023) (quoting *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). Upon appellate review, the standard is nearly identical, tasking us with determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth v. Woods*, 657 S.W.3d 902, 906

(Ky. 2022) (quoting *Potts v. Commonwealth*, 172 S.W.3d 345, 349 (Ky. 2005)) (internal quotation marks omitted); *see also Commonwealth v. Jones*, 497 S.W.3d 222, 225 (Ky. 2016) ("Our standard of review for denial of a directed verdict is whether, under the evidence as a whole, it would be clearly unreasonable for the jury to find [the defendant] guilty[]").  The evidence must be of substance and a directed verdict is appropriate where the Commonwealth produces "no more than a mere scintilla" of such evidence.  *Beaumont v. Commonwealth*, 295 S.W.3d 60, 68 (Ky. 2009) (quoting *Benham*, 816 S.W.2d at 188).

I would hold the Commonwealth produced more than a mere scintilla of evidence showing Upton committed the crime of strangulation against R.D. While true that R.D. stated at trial that Upton never touched her throat and was consistent in saying that Upton only grabbed her by the chin, her testimony was not the sole evidence produced of strangulation.  Trooper Mattingly testified that at the scene R.D. stated Upton grabbed her by the chin, "kinda picked [her] up," and jerked her down the basement stairs.  R.D. suggests this grabbing of the chin was to lift her head such that she was looking at Upton as he spoke, but had Upton grabbed her merely to lift her head he would not have had sufficient grip to lift and jerk R.D.'s entire body toward the basement stairs.  That Upton was able to do so creates a reasonable inference that he grabbed R.D. tightly enough around her chin and neck area such that he impeded her breathing.  The jury was entitled to make that

36

inference, which, it should be pointed out, it did by finding Upton guilty of second-degree strangulation.

Further, the Commonwealth introduced photographic evidence that supported the charge against Upton. The photograph of R.D.'s neck area taken on the night of the incident showed redness, albeit light, extending beyond her chin toward her neck. While the photo is far from definitive, it lends credence to the Commonwealth's argument and provides support for the inference that when Upton gripped R.D.'s "chin" so firmly that he was able to jerk her body around, he also wantonly impeded her breathing.

I recognize the evidence against Upton was far from overwhelming. Only Upton and R.D. witnessed the incident and neither was willing to claim a strangulation took place. Such is all too often the case in instances of domestic violence. Nevertheless, the evidence, scant it may have been, was sufficient to induce a rational factfinder to conclude that Upton strangled R.D. and the count should have been permitted to proceed to the jury. And the jury did not act unreasonably in finding Upton guilty; indeed, the jury clearly considered the paucity of the evidence when it found Upton guilty of the lesser charge of second-degree strangulation. Verdicts may be properly based on reasonable inferences drawn from the evidence. *Clark v. Commonwealth*, 567 S.W.3d 565, 569 (Ky. 2019) ("Application of our 'generally-applied, fundamental principle that a jury verdict may properly be based upon reasonable inferences drawn from the evidence' requires upholding the trial court's denial of [defendant]'s motion for directed verdict." (quoting *Moore v. Commonwealth*,

37

462 S.W.3d 378, 388 (Ky. 2015)). In this instance where that evidence falls nearly upon the line between sufficient and insufficient, we should permit the matter to be passed to the wisdom of the jury, which, in this instance, found that Upton did indeed strangle R.D. during their argument.

Accordingly, I would hold the trial court did not err in denying Upton's motion for a directed verdict.

Bisig and Nickell, JJ. join.

COUNSEL FOR APPELLANT:

Dawn Lynne McCauley

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General